[No. S004726. Crim. No. 25699. Dec. 26, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID REY FIERRO, Defendant and Appellant.

**COUNSEL**

James S. Thomson, under appointment by the Supreme Court, and Michael Laurence for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Louis R. Hanoian and Lilia E. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARABIAN, J.**—Defendant David Rey Fierro was convicted by a jury of first degree murder (Pen. Code, § 187)[1] and two counts of robbery (§ 211). The jury found true the special circumstance allegation that the murder was committed during the perpetration of a robbery (§ 190.2, subd. (a)(17)(i)), and also returned a special finding that defendant shot and killed the victim. As to each count the jury also found that defendant used a firearm to commit the offense. (§ 12022.5.) The jury fixed the penalty at death. This appeal is automatic. (§ 1239, subd. (b).)

### I. FACTS

#### A. *Guilt Phase Evidence*

##### 1. *The Prosecution*

On the evening of January 6, 1985, Sam Allessie was robbed and murdered in front of the small grocery store which he owned with his wife, Trudy, in Glen Avon. Defendant, who was on parole for burglary, was arrested two days later. He was linked to the crimes by eyewitness identifications, fingerprints which he left on the victim's truck, bloodstains in his car, and money from the robbery found in his wallet. As recounted at trial, the facts of this tragic episode unfolded as follows.

About 6 p.m. on the evening in question, Sam and Trudy Allessie were preparing to close their store for the night. As was their custom on Sunday evenings, they planned to deposit the day's receipts in the night slot of their bank and then go to dinner. Trudy had placed in her purse approximately $4,000, comprised of checks, money orders and about $1,000 in cash. The cash was in $50 and $100 denominations. Trudy observed Sam look into his wallet, which he carried in his back pants pocket, for money to pay for dinner.

They left through the front doors of the market and approached Sam's pickup truck. Sam opened the passenger door for Trudy and circled around the back of the truck to the driver's side. As Trudy lost sight of Sam, she heard loud talking from the rear of the truck. Suddenly she saw a "kid" trying to unlock the driver's door with Sam's keys. She became scared and heard Sam holler, "Watch your purse, honey." Trudy opened her door to join her husband and at that moment was confronted by the same "kid" she had seen moments earlier. He demanded money. Trudy responded, "All right, all

---

[1]All further statutory references are to the Penal Code unless otherwise noted.

right," and opened her purse and handed him a bundle of currency. He then grabbed the purse and ran toward the rear of the truck, out of view.

Trudy thereupon started out of the truck and heard a shot.[2] Running to the front of the store she found Sam on the ground, bleeding. As she screamed for help, a light colored car sped out of the parking lot and turned onto Mission Boulevard toward the freeway.

About the time the Allessies were closing the store, Robert Gonzales was in a telephone booth outside the market talking to his girlfriend. Gonzales heard a gunshot and saw a man with a gun. Several seconds later, he observed the man fire a second shot and then run toward a yellow Pacer. As Gonzales took cover, he saw a figure enter the Pacer, which raced away in the direction of the freeway.

That same evening, Carol DiCenso and her husband, Antonio, were driving on Mission Boulevard in the area of Trudy's Market. Carol was in the rear passenger seat. As they approached the market, Carol observed three men standing in a group; one was dressed in a white, short-sleeved T-shirt; the man in the center, Sam Allessie, was dressed in dark clothing; the man to Sam's left was dressed in a black sleeveless tank-top shirt. As the DiCensos' car drove past, Carol saw and heard a gunshot blast fired by the man in the white T-shirt. Sam Allessie slumped to his knees and fell over. Seconds later, the man in the white T-shirt straddled the fallen body, stretched out his arm, and fired another shot into the victim.

Carol DiCenso then observed the man in the white T-shirt bend over, put his arms around the victim in a "hugging" type motion and reach underneath him. In the meantime, the other man in the dark shirt, who had been standing nearby, started to run away. The shooter followed, running toward a car which had its lights on. Moments later, Benita Watson, who was a passenger in another car travelling down Mission Boulevard, noticed a light colored AMC Pacer with a chrome luggage rack travelling in the same direction. Ms. Watson heard a woman scream and heard shouts to "follow that car." The Pacer then accelerated and pulled away.

Sam was dead when the police arrived at the scene. His car keys and wallet were missing. Blood spots and a bloody shoe print were observed leading away from the body. Based on the descriptions of the assailant and the getaway car and conversations with local law enforcement officers, Sergeant Turley of the Riverside Sheriff's Department focused on defendant

---

[2]Although Mrs. Allessie testified that she heard two shots, she was unsure when the second shot occurred.

as a possible suspect. Within several days, it was discovered that four fingerprints lifted from Sam Allessie's truck matched defendant's fingerprints. Shortly thereafter, defendant was detained and taken into custody. When he was stopped, he was driving an AMC Pacer with a luggage roof rack. His girlfriend, Laura Garcia (hereafter Laura Fierro),[3] and a small child were passengers in the car. A search of Laura Fierro's purse at the station disclosed a man's wallet containing defendant's driver's license. The wallet contained $650 in cash, comprised of four $100 bills and five $50 bills.

Several weeks later, Mrs. Allessie identified defendant from both a photographic and a live lineup. At trial, she identified defendant as the man who had robbed her. Robert Gonzales also picked defendant from a photographic lineup.[4] Although Carol DiCenso could not identify the man she saw that evening, her description of the shooter as wearing a light colored T-shirt matched Mrs. Allessie's description of defendant.

A search of Laura Fierro's house, where defendant lived, revealed several white short-sleeved T-shirts and a pink slip for the Pacer signed by defendant. Human blood was found on the sole of one of defendant's shoes. Testing could only determine that it was human blood. A search of defendant's Pacer revealed dried blood in the area of the front passenger door. Testing determined that it was not that of defendant but was consistent with the blood of Sam Allessie.

An autopsy disclosed that the victim died of two gunshot wounds to the chest. One wound was consistent with having been fired from a distance of up to 12 inches while the victim was standing, allowing the bullet to exit through the back. The other was a larger "contact" wound, meaning the muzzle of the gun was in contact with the victim's clothes. The nature and size of the entry wound, the bullet's trajectory, the crush-type injuries to the back and the piece of bullet lodged in the back all indicated that the victim was lying on the ground when the shot was fired. Dr. Hunter, who performed the autopsy, determined that the smaller wound was inflicted first, and that the larger "contact" wound was inflicted shortly thereafter. Either wound would have been fatal.

### 2. The Defense

The defense called several witnesses to show that a person other than defendant was seen leaving the scene after the shooting. Hubert Joubert, who lived across the street from Trudy's Market, testified that he saw a Mexican

---

[3]Defendant married Laura Garcia 10 months after his arrest.
[4]Gonzales stated that he was "not positive," but identified defendant as the shooter.

male wearing some sort of checkered jacket walking away from the scene shortly after the shooting. When this individual was a block away he "took off running." Joubert also stated that he saw two cars driving away from the scene on Mission Boulevard. Lori James, who also lived near the market, stated that she heard two gunshots and saw two men running from the scene; one of them had on a white T-shirt; she did not see the other because he had entered a yellow Pacer. The man in the T-shirt entered the passenger side of the car. Charles Dickey, who was driving his tow truck on Mission Boulevard, observed a Pacer similar to defendant's but with a different license plate.

Defendant also called several deputy sheriffs who spoke with Trudy Allessie shortly after the crimes; defendant attempted to impeach Mrs. Allessie's trial testimony with prior inconsistent statements as to precisely when and where she heard the two shots, and the manner in which the robber took her purse.

Defendant also called two expert witnesses. David Duncan testified that the lack of damage to the bullet recovered from the victim's back indicated that it had been fired while the victim was standing, rather than lying on the ground. Jules Slaick testified as to various distances at the crime scene and the location of light fixtures.

Defendant did not testify at the guilt phase of trial.

B. *Penalty Phase Evidence*

The prosecution presented evidence of defendant's prior violent conduct in connection with a 1982 burglary conviction. The victim of the burglary, Tim Deno, recounted the circumstances of the crime. Defendant stipulated that he pled guilty to burglary with use of a deadly weapon.

In mitigation, defendant testified in his own behalf, denying that he shot and killed Sam Allessie. Six members of defendant's family also testified as to defendant's poor relationship with his father, his participation in Little League and school plays, and his close and loving relationships with his siblings, wife and children. Defendant's aunt claimed that the actual killer was another member of the family defendant was seeking to protect.

## II. Discussion

### A. *Guilt Phase Claims*

#### 1. *Alleged Marsden Error*

 Defendant contends the trial court failed to conduct a proper inquiry when defendant asserted a conflict with the public defender and erred in denying defendant's request to appoint a private attorney.

The law governing this area is well settled. "When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations]." (*People* v. *Crandell* (1988) 46 Cal.3d 833, 854 [251 Cal.Rptr. 227, 760 P.2d 423]; see also *People* v. *Marsden* (1970) 2 Cal.3d 118, 124-125 [84 Cal.Rptr. 156, 465 P.2d 44].)

 Defendant complained about his representation by the public defender's office on three occasions. The first occurred on June 17, 1985, after the preliminary hearing but prior to arraignment on the information. At an in camera hearing out of the presence of the prosecutor, defendant expressed dissatisfaction with the fact that he had been represented by three different deputy public defenders.[5] Defendant requested a new attorney, preferably one outside of the public defender's office, apparently in the hope that this would entitle him to a new preliminary hearing. The trial court expressed sympathy with defendant's frustration over the change of attorneys but explained that it did not provide a legal basis for the appointment of private counsel; the court further explained that a substitution of attorneys would not entitle defendant to a new preliminary hearing. The court also assured defendant that it was familiar with the three deputies and that each was competent and well qualified. After a short recess, defendant was arraigned and agreed to waive time for trial.

The record thus discloses that defendant did not assert either incompetence of counsel or irreconcilable differences with the public defender at the

---

[5]The first deputy assigned to the case left the office prior to the preliminary hearing. His replacement, Rick Siref, represented defendant through the preliminary hearing. On June 10, 1985, about three weeks prior to the scheduled trial date, Mr. Siref was relieved as counsel because he too was leaving the office. Siref was replaced by Deputy Public Defender John Morris, who represented defendant throughout the remainder of the proceedings.

first in-chambers conference. Accordingly, there was no abuse of discretion in denying the request for substitution of counsel. (*People* v. *Moore* (1988) 47 Cal.3d 63, 76 [252 Cal.Rptr. 494, 762 P.2d 1218].)

The second in camera hearing was convened on April 11, 1986, to inquire into an earlier statement by defendant that he was not "comfortable" with his attorney.[6] Defendant indicated that he did not "trust" his attorney because the latter had "lied" to him. When pressed by the court to elaborate, however, defendant was unable to describe any specific lies by counsel or any circumstances where he had been misled.

Defendant also indicated that he was dissatisfied with counsel because the latter wanted him to take a "deal" which he was unwilling to take. Again, however, defendant was unable or unwilling to elaborate. The court reminded defendant that one week earlier he had asked both attorneys, outside of defendant's presence, if a disposition was possible. Although counsel indicated that defendant would not plead guilty to first degree murder and the prosecutor stated that he would not accept anything less than life without possibility of parole, the court nevertheless directed counsel to convey the offer to defendant. After a short time, counsel returned to inform the court that defendant would not accept the plea.

The trial court asked defendant if this explanation had helped to "jog" his memory. Defendant responded that "it wasn't all clear like that" when counsel had spoken to him. Nevertheless, defendant remained adamant that he did not trust his attorney, and complained about counsel's performance at pretrial motions. Counsel, in response, stated that he had consulted sufficiently with defendant in preparing the case, had adequately investigated the facts and law and was prepared for trial. He acknowledged, however, that defendant did appear to distrust him, explaining that defendant had discouraged his brothers from cooperating with the investigation because he feared counsel would disclose the results to the district attorney. Counsel indicated that he had said and done nothing to cause defendant to distrust him. The trial court assured defendant that there was no connection between the public defender's office and the district attorney, and observed that his attorney had done an "exemplary" job at pretrial motions. Finally, the court asked defendant if he had any other reasons for seeking other counsel. Defendant responded, "I just want another attorney." The court thereupon found there was

[6]Defendant's statement came at the conclusion of a hearing conducted one week earlier on his section 995 motion to dismiss. Defendant asserts that the motion raised a claim of ineffective assistance at the preliminary hearing, thus creating a conflict of interest because counsel at the preliminary hearing was a fellow member of the public defender's office. The record, however, discloses no such claim. Counsel merely argued that defendant had been prejudiced by the lack of continuity of counsel and observed that he might have handled the preliminary hearing differently.

no basis to conclude that counsel was not providing effective assistance or that a breakdown in the attorney-client relationship had occurred such that defendant's right to effective assistance would be substantially impaired.

The record amply supports the trial court's findings. As outlined above, the court carefully inquired into defendant's reasons for requesting substitution of counsel, which proved to be either groundless or patently insufficient to demonstrate "such an irreconcilable conflict that ineffective representation [was] likely to result." (*People* v. *Crandell, supra,* 46 Cal.3d at p. 854; *People* v. *Moore, supra,* 47 Cal.3d at p. 76.)

Finally, defendant was accorded a third in camera hearing shortly after the guilty verdicts were rendered and before the commencement of the penalty phase. The purpose of the hearing, according to counsel, was to express defendant's continuing objection to representation by the public defender. Although defendant was not displeased with his attorney's performance and had cooperated fully throughout the guilt phase, he did not feel "comfortable" because the public defender's office "worked for the same employer as the District Attorney's office."

Counsel also noted that he had differed with defendant over trial strategy; while counsel had originally advised defendant to admit participation in the crime and direct his defense to the special circumstance, defendant was disposed to deny participation altogether. Ultimately, defendant's views prevailed. Counsel also advised the court that he anticipated another potential conflict at the penalty phase; contrary to the advice of counsel, defendant did not wish to call members of his family as witnesses "because he feels that they have suffered enough." When asked if he had anything to add to his attorney's statement, defendant simply reiterated his displeasure at the fact that he had been represented by different deputy public defenders; he added that he did not desire to change attorneys.

Thus, the record of proceedings at the third in-chambers hearing discloses neither a request for substitution of counsel, nor any credible evidence of a lack of diligent representation or a breakdown in the attorney-client relationship. The record utterly fails to support defendant's repeated claims that a lack of "trust" between himself and counsel impaired his representation. On the contrary, counsel apparently deferred to defendant's preferred strategy at the guilt phase, and defendant ultimately followed counsel's advice to call family members at the penalty phase.

Accordingly, we find no basis for concluding that the trial court either failed to conduct a proper *Marsden* inquiry or abused its discretion in

declining to substitute counsel. (*People* v. *Silva* (1988) 45 Cal.3d 604, 622 [247 Cal.Rptr. 573, 754 P.2d 1070].)

### 2. *Prosecutorial Misconduct*

Defendant next argues that the prosecutor committed prejudicial misconduct at several points during voir dire and closing argument.

#### a. *Voir Dire*

##### (i) *The Adversarial Process*

Both attorneys commented on the nature of the adversarial process during voir dire. Defense counsel analogized the upcoming trial to a "game" and observed that each side was seeking essentially the same goal, "each of us is trying to win for our team . . . ." The prosecutor, in response, emphasized that his role was not "strict[ly] adversarial," that his "client" was the people of the state and that he was thereby obligated to ensure that "people receive fair trials" and not simply "convict those charged with crimes and throw justice and equity out the door." To illustrate the point, the prosecutor noted that he had "an obligation ethically in seeking justice to make sure [defense counsel] knows about all the witnesses I intend to call, what they are going to say, what they saw, all of those things. [¶] This isn't just a game . . . ." By way of contrast, the prosecutor observed that defense counsel "has no obligation under our system of justice to reciprocate, to tell me where they're going or what they may do or who they may call." He is "an adversary," the prosecutor explained, "pure and simple." "He must represent his client and his sole obligation within certain ethical grounds is to obtain an acquittal for his client."

Defendant now contends that the prosecutor's remarks "grossly distorted" the adversarial process, impugned the ethics of defense counsel and improperly used the prestige of his office to bolster the state's case. As the People correctly observe, however, defendant failed to object to any of the prosecutor's remarks, thereby waiving his present objections. "It is, of course, the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People* v. *Benson* (1990) 52 Cal.3d 754, 794 [276 Cal.Rptr. 827, 802 P.2d 330]; see also *People* v. *Ratliff* (1986) 41 Cal.3d 675, 690-691 [224 Cal.Rptr. 705, 715 P.2d 665]; *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].)

Furthermore, the prosecutor's statements were not objectionable on the grounds asserted by defendant. It is not a distortion but a simple

fact that the prosecutor " 'is the representative not of any ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' " (*People* v. *Superior Court* (*Greer*) (1977) 19 Cal.3d 255, 266 [137 Cal.Rptr. 476, 561 P.2d 1164], quoting *Berger* v. *United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629]; accord *People* ex rel. *Clancy* v. *Superior Court* (1985) 39 Cal.3d 740, 746 [218 Cal.Rptr. 24, 705 P.2d 347].) The prosecutor was also factually correct in noting that discovery in the criminal context was *not* a two-way street; the prosecution's disclosure obligations were not reciprocated by the defense. (*In re Misener* (1985) 38 Cal.3d 543 [213 Cal.Rptr. 569, 698 P.2d 637]; but see *Izazaga* v. *Superior Court* (1991) 54 Cal.3d 356 [285 Cal.Rptr. 231, 815 P.2d 304].) Nor do we believe the jury could reasonably have interpreted the remarks as impugning the ethics of defense counsel, or as an improper attempt to bolster the state's case.

### (ii) *Right to Remain Silent*

Another area of discussion at voir dire concerned defendant's right not to testify. In emphasizing that defendant's silence could not be used against him, defense counsel observed that there might be plausible reasons why defendant, although innocent, would choose not to take the witness stand. Later, the prosecutor also stated that defendant had a right to remain silent and explained, "you can't hold that against the defendant. You can't consider that." Recalling defense counsel's remark as to why an innocent person might not testify, the prosecutor further observed that "there might be reasons why a guilty man doesn't want to take the stand also and testify." However, he then repeated his admonishment not to "even think about this . . . . It would be totally inappropriate for you to think about . . . this and try to guess about why somebody does [not testify]."

Shortly thereafter, defense counsel, out of the presence of the jury panel, expressed concern about the prosecutor's remarks and requested an admonition relating to defendant's right to remain silent. The trial court declined the request, explaining that it had already admonished each juror on the burden of proof and defendant's right not to testify, and believed that the subject had been adequately covered.

■ Defendant now contends the prosecutor's remark prejudicially urged the jury to consider defendant's silence as evidence of his guilt. While it may have been ill-considered to state that a guilty person may have reasons not to testify just as an innocent person might, we do not believe the prosecutor's

statement could reasonably have been construed as urging the jury to consider defendant's silence as evidence of guilt. Indeed, as noted, the prosecutor followed this remark with a further admonition not to consider the matter. Accordingly, we discern no possibility that the statement subjected defendant to prejudice. (*People* v. *Warren* (1988) 45 Cal.3d 471, 480 [247 Cal.Rptr. 172, 754 P.2d 218].)

### (iii) *Hypothetical Scenario*

■ Defendant next contends the prosecutor improperly influenced prospective jurors to "prejudge" guilt. ■ It is, of course, well settled that the examination of prospective jurors should not be used " 'to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.' " (*People* v. *Williams* (1981) 29 Cal.3d 392, 408 [174 Cal.Rptr. 317, 628 P.2d 869], quoting *Rousseau* v. *West Coast House Movers* (1967) 256 Cal.App.2d 878, 882 [64 Cal.Rptr. 655].)

■ The prosecutor posed a hypothetical scenario to the jury panel and asked for individual responses. Essentially, he asked the jurors to state whether they would be able to vote guilty if, after deliberations, they were persuaded that the charges had been proved beyond a reasonable doubt. Defense counsel objected on the ground that he did not understand the question. The trial court overruled the objection, finding that the question was clear and that the jurors were able to understand it. Thereafter, the prosecutor explained to the jurors that he was "not trying to bias you or trying to get you to believe [defendant] is already guilty . . . ." Rather, he explained, he posed the question simply because some people have difficulty voting guilty regardless of the evidence.

Defendant failed to object to the hypothetical question on the ground now asserted on appeal; thus his objection is waived. (*People* v. *Ratliff, supra,* 41 Cal.3d at p. 691.) Moreover, we discern no impermissible attempt by the prosecutor, in the guise of the hypothetical scenario, to influence prospective jurors to vote guilty; nor do we perceive any possibility that such influence occurred.[7]

---

[7]Defendant correctly notes that one prospective juror indicated she was "bothered" by the question. However, the prosecutor explained that he was not attempting to learn how she would actually vote at trial, but simply whether she could vote guilty if the evidence warranted it. The juror indicated that she understood the question and responded that she would have no problem returning a guilty verdict under those circumstances.

### (iv) *Hold-out Jurors*

█ Defendant also contends the prosecutor impermissibly "indoctrinated" prospective jurors about the "impropriety" of hold-out jurors. Defendant refers to a series of remarks by the prosecutor in which he observed that each juror must "come to your own conclusion," but also stressed the value of "work[ing] together to try to discover the truth."[8] Defendant failed to object to any of the prosecutor's remarks, thereby waiving his present objections. (*People* v. *Ratliff, supra,* 41 Cal.3d at p. 690.) Moreover, we have reviewed the prosecutor's statements and discern no reasonable possibility that they misled prospective jurors concerning their responsibility to exercise independent judgment.

### b. *Argument*

Defendant also raises several instances of alleged prejudicial misconduct during the prosecutor's closing argument.

---

[8]The precise comments to which defendant objects are as follows: "I think similarly that's why we have a jury. Okay. We have 12 people because all of you have common sense, all of you have life experience and you can help one another in coming up with the truth in a case like this. [¶] Now, based on that, I want you to consider a little bit about your role as an individual juror. Certainly you're individuals and each of you have [*sic*] to look at this case, the evidence and the law, and come to your own conclusion. That goes without saying. [¶] We do not want a herd here . . . . That's not what we're looking for. [¶] But on the other hand, we're not looking for 12 quote leaders or 12 strong, rugged individualists that will intentionally fight with the other 11 to try to show how individual they are. [¶] . . . What we're looking for is 12 people, individuals who will work together to try to discover the truth. [¶] . . . There's nothing wrong in a juror with being a quote follower if the reason you are following is because you're seeing that that is the truth and you concur with the truth and you're going along with the truth . . . . [¶] . . . It's wrong to be a follower to just say, 'I don't want to thing [*sic*] about this case. You guys make up your minds and whatever you say I'll go along.' That, of course, we don't need. But there's nothing wrong with being a follower if you're following based on the truth. . . ."

In responding to one juror who stated that she would work to persuade the other jurors if she were outvoted 11 to 1, the prosecutor stated: "Okay. And that's a good answer. But I would hope, ma'am, that you would also consider that, say, 'You know, I have been with these people now three or four weeks. We've had lunch together. We sat in the hallway and talked. And they all seem to be reasonable folks. And 11 of them came to a different conclusion than I did. Maybe before I try to persuade them to my view I ought to take the time to consider where they came to a different conclusion than I did, listen to their thoughts and reasoning, see if maybe I missed something. [¶] . . . 12 individuals not intentionally tugging at each other, but rather working together, if possible, to get at what the truth is and use that truth in arriving at a verdict. [¶] . . . There is nothing to be gained in our system of justice by having somebody try to prove how much of an individual or leader they are just to show that fact . . . ."

### (i) *Vouching*

The prosecutor concluded his guilt phase argument as follows: "The evidence and the facts in this case, ladies and gentlemen, I submit to you are very clear. This is an outstanding murder case. It was an outstanding murder investigation. [¶] When you look at all of the evidence in this case and you do your own analysis . . . , thinking back over the witnesses that have testified and their credibility, and then match that with the law that covers the crimes that this defendant is charged with, you, too, will see very clearly and very obviously that the defendant is guilty . . . ."

 Defendant contends the prosecutor's characterization of the case and the murder investigation as "outstanding" placed the personal reputation of the prosecutor and his office behind the prosecution. Impermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony. (*People* v. *Heishman* (1988) 45 Cal.3d 147, 195 [246 Cal.Rptr. 673, 753 P.2d 629]; *U.S.* v. *Wallace* (9th Cir. 1988) 848 F.2d 1464, 1473.)

 Defendant failed to object to the prosecutor's remarks, and thereby waived his objection on appeal. (*People* v. *Ratliff, supra,* 41 Cal.3d at p. 690.) Moreover, we do not believe that the prosecutor's remarks, viewed singly or in context, could reasonably have been interpreted as a personal endorsement of the state's witnesses. Indeed, the remark was followed immediately by an admonition to the jurors to "do *your own* analysis" of the evidence and then "match that with the law." (Italics added.) Accordingly, we discern no impropriety.

### (ii) *Appealing to Jury's Prejudices*

 Defendant next asserts the prosecutor attempted to arouse the jury's prejudices by implying that defendant was a gang member with a criminal record. He cites the prosecutor's reference during argument to the fact that Fontana Police Detective Moore had "known [defendant] for all of the years he's worked in Fontana." Moore's testimony that he had recognized defendant from having previously seen him at a little market in Fontana was corroborative of Robert Gonzales's recollection of having seen defendant at Trudy's Market several months before the murder. Thus, the prosecutor's reference to Detective Moore's testimony was simply to establish that defendant frequented the area of the crime scene prior to the murder. At no point did the prosecutor suggest, either expressly or impliedly, that defendant had a prior record.

The alleged reference to a gang affiliation occurred earlier in the trial, during defense counsel's cross-examination of Mrs. Allessie. The witness acknowledged that she had not observed any tattoos on the robber. Defense counsel thereupon had defendant show the jury the tattoos on his arms. The prosecutor responded: "Your honor, I would also be willing to stipulate that counsel could have [defendant] describe to the jury the significance of each of the tattoos and describe them for the record." Defense counsel objected on the grounds of relevance and the matter was dropped. Later, the jury was instructed: "At one point a comment was made regarding the significance of [defendant's] tattoos. There is no evidence before you regarding any significance of these tattoos except on the issue of eye witness identification. You are not to speculate on any other significance of these tattoos." We conclude, therefore, that any possible harm caused by the prosecutor's brief remark was cured by the court's admonition, which the jury presumably obeyed. (*People* v. *Rosoto* (1962) 58 Cal.2d 304, 326 [23 Cal.Rptr. 779; 373 P.2d 867].)

(iii) *Attack on Defense Counsel*

 Defendant contends the prosecutor made a number of statements during his rebuttal argument attacking the personal integrity of defense counsel. It is, of course, improper for the prosecutor "to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case. . . . Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom." (*People* v. *Thompson* (1988) 45 Cal.3d 86, 112 [246 Cal.Rptr. 245, 753 P.2d 37].)

 We note at the outset that defendant failed to object to any of the statements in question, thereby waiving his right to object on appeal. (*People* v. *Ratliff, supra,* 41 Cal.3d at p. 690; *People* v. *Bell* (1989) 49 Cal.3d 502, 538-539 [262 Cal.Rptr. 1, 778 P.2d 129].) Nevertheless, we have reviewed each of the statements in question and find that, with one exception, they did not cross the line of acceptable argument, which is traditionally vigorous and therefore accorded wide latitude. (*People* v. *Bell, supra,* 49 Cal.3d at p. 539; *People* v. *Thompson, supra,* 45 Cal.3d at pp. 112-113.)[9]

 In one instance the prosecutor's statement appears to have been clearly intended as a personal rebuke to defense counsel. Counsel had

---

[9]The specific statements to which defendant objects include the following: "[Defense counsel] has given you a very typical presentation of a defense attorney who has nothing of substance to say." "[Defense counsel], of course, doesn't choose to remind you that [he] is on

suggested that many of the state's witnesses altered their testimony to please the prosecution. At the same time, counsel stressed that he was not suggesting the prosecutor "put the witnesses up to this." In rebuttal, the prosecutor stated: "I don't know if you are offended, I can tell you that I am certainly offended at what I would consider the duplicity of the argument. [Defense counsel] has spent the last three hours saying that all of the witnesses got together and that the sheriff and myself have coached them and molded them . . . to come to court to say these things. And then [defense counsel] actually has the gall to just before sitting down say: Now, folks, I don't mean to in any way affirm—or infer (sic) that [the prosecutor] has done anything inappropriate."

Although the statement was somewhat ad hominem, we perceive no realistic likelihood that it prejudiced defendant.

### (iv) *Failure to Testify*

Finally, defendant asserts that the prosecutor made improper reference to defendant's failure to testify. (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) In rebuttal argument, the prosecutor urged the jury to reject counsel's assertion that the special circumstance had not been proved beyond a reasonable doubt, stating: "Again, the defense is asking you to do something; and that is, find that particular charge is not true. *But they're giving you no evidence on which to do that.*" (Italics added.)

As the People correctly observe, defendant failed to object to the statement, thereby waiving his present objection. (*People* v. *Ratliff, supra,* 41 Cal.3d at p. 690.) Moreover, the *Griffin* rule does not extend to remarks, such as those here, which merely comment "on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses." (*People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213]; *People* v. *Ratliff, supra,* 41 Cal.3d at p. 691.) Accordingly, we find no constitutional violation.

---

the pay[roll] of the State of California and works for the same agency that I do and these [expert witnesses] do." "You don't believe for a moment that if [defense counsel] could find somebody out there who was an expert in those fields that would come in and tell you the sorts of things that he's actually trying to persuade you of out of the thin air, that he wouldn't have had those people there." And, "I am sure if [defense counsel] had the chance to come back, he'd come back and say, 'Well, these photos weren't really taken the night in question. We went out there and set up special lights to get this effect.' And that's just bunk."

### 3. Serological Evidence

Defendant challenges the trial court's decision to admit an expert's electrophoretic analysis of dried bloodstains found in his car.[10] Based on that analysis, the expert concluded that the bloodstains could not have come from defendant, but could have come from the victim. Defendant also challenges the expert's reference to population frequency statistics which excluded defendant, but included the victim, as the source of the bloodstains.

 Defendant contends the prosecution failed to meet the standard criteria of reliability under *Kelly/Frye*: (1) general acceptance in the relevant scientific community; (2) testimony by properly qualified experts; and (3) the application of correct scientific procedures in the case under review. (*People v. Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [54 App.D.C. 46].)

We have recently held that electrophoretic testing of dried bloodstains is sufficiently accepted in the scientific community to be admissible under the first prong of *Kelly/Frye*. (*People v. Morris* (1991) 53 Cal.3d 152, 207 [279 Cal.Rptr. 720, 807 P.2d 949]; *People v. Cooper* (1991) 53 Cal.3d 771, 812 [281 Cal.Rptr. 90, 809 P.2d 865].) ██ █ Nothing in the instant record impels us to reconsider our rulings.[11]

 Defendant also asserts that the particular method of testing utilized in this case, the multisystem method, has not achieved general acceptance in the scientific community. As we recently observed, however, once electrophoresis is deemed to be admissible, criticism of any particular methodology goes to the weight of the evidence, not to its admissibility. (*People v. Cooper, supra*, 53 Cal.3d at pp. 812-813.) Moreover, the cases have uniformly held that the multisystem method of analysis enjoys general acceptance within the scientific community under *Kelly/Frye* standards. (*People v. Smith, supra*, 215 Cal.App.3d at p. 26; *People v. Morris* (1988) 199 Cal.App.3d 377, 384-390 [245 Cal.Rptr. 52].) Defendant cites no persuasive evidence to the contrary.

---

[10]An analysis was also done on a bloodstain found on one of defendant's shoes. The blood was determined to be of human origin, but the sample was apparently insufficient to yield any meaningful eletrophoretic test results.

[11]At the pretrial admissibility hearing, defense counsel stipulated that the trial court could rely on the trial testimony of five electrophoresis experts at *Kelly/Frye* hearings in two unrelated trials, *People v. Reilly* (1987) 196 Cal.App.3d 1127 [242 Cal.Rptr. 496], and People v. Walsh (Super. Ct. Alameda County, 1986, No. 11-6621). The trial court properly considered the findings in the *Reilly* and Walsh cases in determining the reliability of electrophoresis testing. (*People v. Morris, supra*, 53 Cal.3d at p. 207; *People v. Smith* (1989) 215 Cal.App.3d 19, 25-26 [263 Cal.Rptr. 678].)

As to the second prong of *Kelly/Frye*, defense counsel raised no challenge, either at the evidentiary hearing or at trial, to the qualifications of the Department of Justice criminalist who testified in this case, Faye Springer, and asserts no specific challenge to her qualifications on appeal.

With respect to the third prong, counsel expressly stipulated at the evidentiary hearing that Springer had used correct and appropriate scientific procedures in the analysis of the blood samples. Counsel further stipulated that Edward Blake, a recognized expert in the field, had reviewed Springer's notes of her analysis of the blood samples and had agreed that appropriate scientific procedures were followed in this case. Thus, defendant has waived any objection on appeal. (*People* v. *Carrera* (1989) 49 Cal.3d 291, 323-324 [261 Cal.Rptr. 348, 777 P.2d 121]; *People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048].)[12] In any event, defendant has not demonstrated any deficiency in the testing procedures, or any act or omission which might have affected the reliability of the results in this case.

■ For the first time on appeal, defendant also attacks the electrophoresis evidence as hearsay (Evid. Code, §§ 801, 1200) and irrelevant (Evid. Code, §§ 210, 350), and further asserts that the evidence was more prejudicial than probative. (Evid. Code, § 352.) Defendant's failure to raise any of these objections at trial constitutes a waiver of his objections on appeal. (*People* v. *Carrera, supra,* 49 Cal.3d at pp. 323, 324.)

■ Finally, defendant claims the court erred in admitting Ms. Springer's testimony that, based on population frequency statistics, only one-half of 1 percent of California's general population had the victim's blood type. Defendant failed to object to the admissibility of this testimony at trial, thereby waiving his objection on appeal. (*People* v. *Rogers, supra,* 21 Cal.3d at p. 548.) Moreover, the contention is unavailing. As we explained in *People* v. *Brown* (1985) 40 Cal.3d 512 [230 Cal.Rptr. 834, 726 P.2d 516]: "[B]oth California and the majority of other jurisdictions have traditionally admitted statistical blood-group evidence of this kind in criminal cases, even where it simply includes the accused within the class of possible donors. [Citations.]" (*Id.* at p. 536, fn. 6; see also *People* v. *Yorba* (1989) 209 Cal.App.3d 1017, 1026-1027 [257 Cal.Rptr. 641] [electorphoresis evidence admissible to show that markers in bloodstain are found in 4.6 to 14 percent of the population]; *People* v. *Morris, supra,* 199 Cal.App.3d at p. 391 [trial court properly admitted electrophoretic evidence that 3.5 percent of the population of Ventura County could have deposited bloodstain].)

---

[12]At trial, defendant raised no challenge to the testing procedures employed by the state's expert. On cross-examination, defense counsel merely inquired whether environmental conditions could degrade the sample, thereby causing unreliable test results.

Defendant also cites *People* v. *Collins* (1968) 68 Cal.2d 319 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176], for the proposition that statistical evidence may mislead a jury by suggesting a mathematical probability of guilt. The reliance is misplaced. In *Collins*, the prosecutor called a mathematics instructor to testify that, based on eyewitness descriptions, there was one chance in twelve million that any couple possessed the physical characteristics of defendants. (*Id.* at p. 325.) We reversed, concluding that the expert's deduction was not based on statistical data derived from scientific research, but on statistical theory unsupported by any evidence. (*Id.* at p. 327.) The same flaws were not present here. The trial court did not abuse its discretion in admitting the population frequency statistics.

### 4. *The Motion to Suppress*

 Defendant contends the trial court erroneously denied a motion to suppress certain evidence, including his wallet and its contents ($650), seized from his girlfriend's purse. The trial court found that defendant lacked standing to contest the search, that the search was reasonable under the circumstances, and that it was conducted pursuant to a valid parole search waiver. Defendant challenges each of the trial court's findings.

The evidence presented at the suppression hearing revealed the following: Two days after the shooting, defendant was stopped in his yellow AMC Pacer and placed under arrest. Defendant's girlfriend, Laura Fierro, and her young child were passengers in the car.[13] An officer on the scene requested that she come to the police station to speak with detectives there. She agreed to do so and was driven to the station by one of the officers, who recalled that in addition to the child she had a large purse in her possession. After a short wait at the station, Fierro was interviewed by Sergeant Turley. Because she was not in custody or considered a suspect, he did not read her the *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) Ms. Fierro's three-year-old child, Detective Bowen and a deputy district attorney were also present during the interview.

At the conclusion of the conversation, Laura Fierro asked to use the women's restroom. Bowen pointed out where the restroom was located, and Fierro picked up her purse and started to leave. Because it was large enough to contain a handgun and the murder weapon had not been recovered, Bowen became concerned that the purse might contain a weapon. Accordingly, he asked her if he could search the purse. She responded, "Go—yes, you may."

[13]Shortly before trial, defendant and Ms. Fierro were married. However, at the time of the events in question, defendant and Ms. Fierro were not married.

The first thing Bowen noticed inside the purse was a pair of brown gloves. Bowen asked whose they were and Fierro responded, "Those are David's gloves. His wallet is in my purse also." Bowen asked if he could remove the gloves and wallet and Fierro assented. Bowen continued to search for a weapon but found none. Then, aware that defendant was on parole and subject to parole search terms, Bowen opened the wallet and found defendant's driver's license and $650 in cash.

Based on the foregoing, we conclude that the evidence amply supports a finding that Laura Fierro voluntarily consented to the search. (*People* v. *James* (1977) 19 Cal.3d 99, 106 [137 Cal.Rptr. 447, 561 P.2d 1135].) She displayed no hesitation in providing her permission when Detective Bowen asked if he could search the purse for weapons. Moreover, contrary to defendant's claim, there is no evidence of any coercion, compulsion or express or implied assertion of police authority which might have vitiated the consent. Nor was there any illegal detention or need for *Miranda* warnings. The evidence indicates that Ms. Fierro accompanied the police to the station voluntarily, and voluntarily cooperated with their investigation. She was not a suspect, and was not under arrest or subject to any physical constraint. There is no evidence that she refused to talk to the officers or voiced a desire to leave at any point. The interview was conducted in a large, open office rather than an interview room, and Ms. Fierro's child was present throughout the interview. Substantial evidence, therefore, demonstrates that the warrantless search of Ms. Fierro's purse was conducted pursuant to a legally valid consent.

The subsequent search of defendant's wallet after it was removed from Laura Fierro's purse was also valid pursuant to defendant's parole search condition.[14] The day before defendant's arrest, Sergeant Turley contacted Lee Kano, defendant's parole agent, and informed him that defendant was a suspect in a murder. Kano immediately put a parole hold on defendant. The next day, Turley relayed additional information to Kano linking defendant to the murder and robbery; the new information confirmed that fingerprints found on the victim's truck belonged to defendant, and that a car seen by several witnesses matched the description of defendant's yellow Pacer.

---

[14]There is some evidence that the consent extended not only to a search of the purse, but also the wallet. After Laura Fierro gave permission to Detective Bowen to the search of the purse, he opened the purse and noticed a pair of brown gloves. He asked whom they belonged to and she told him, "Those are David's gloves. His wallet is in my purse also." Fierro then gave permission to remove both the gloves and the wallet from the purse. Detective Bowen did so, opened the wallet and found defendant's driver's license and cash. Thus, although somewhat ambiguous, it could be argued that Ms. Fierro's identification of the wallet carried an implied consent to search. However, in light of the valid parole search, we need not decide this issue.

Based on this information, Kano told Turley that "he was free to go anywhere," i.e., "to search his car, his home, anything" pursuant to defendant's parole search condition.

The foregoing was more than adequate to give rise to a reasonable suspicion that defendant was involved in criminal conduct, and therefore amply justified the parole agent's decision to authorize the search. (*People* v. *Burgener* (1986) 41 Cal.3d 505, 536 [224 Cal.Rptr. 112, 714 P.2d 1251].) Defendant also asserts that the purpose of a criminal investigation cannot justify the invocation of parole terms. On the contrary, the fact "[t]hat the search was conducted by law enforcement officers for a law enforcement purpose is irrelevant. . . . The law enforcement purpose of the police who seek authorization from the parole agent for a warrantless search, and the parole supervision purpose of the agent who gives that authorization are indistinguishable." (*Id.* at p. 536; accord *People* v. *Johnson* (1988) 47 Cal.3d 576, 594-595 [253 Cal.Rptr. 710, 764 P.2d 1087].)

Therefore we conclude that the search was reasonable under the Fourth Amendment. The motion to suppress was properly denied.[15]

### 5. *Shackling of Defendant at the Preliminary Hearing*

At the preliminary hearing, defense counsel noted that defendant was dressed in jail garb, that he was handcuffed and that his feet were shackled. Counsel's request that the handcuffs and shackles be removed was summarily denied. Defendant raised the shackling issue in a subsequent section 995 motion to dismiss, which was also denied. Defendant now asserts that the court erred in refusing to have the shackles removed, and that the error prejudicially tainted the witnesses' identification of defendant as the perpetrator.

 It is, of course, well settled that during a trial "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People* v. *Duran* (1976) 16 Cal.3d 282, 290-291, fn. omitted [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; accord *People* v. *Cox* (1991) 53 Cal.3d 618, 651 [280 Cal.Rptr. 692, 809 P.2d 351]; *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 94-95 [270 Cal.Rptr. 817, 793 P.2d 23].) We have not previously addressed the question whether the restrictions on the use of physical restraints at trial should apply at a preliminary hearing. One

---

[15]Because we conclude that the search of the purse and wallet was valid pursuant to a voluntary consent and a parole condition, we need not address the question of defendant's standing to challenge the search.

decision of the Court of Appeal has reasoned that the policies which underlie such restrictions have application to other proceedings as well. (*Solomon* v. *Superior Court* (1981) 122 Cal.App.3d 532, 536 [177 Cal.Rptr. 1].) We agree.

As early as 1871, we noted in *People* v. *Harrington* (1871) 42 Cal. 165, the common law rule that a prisoner "brought into the presence of a Court for trial . . . was entitled to appear free of all manner of shackles or bonds . . . ." (*Id.* at p. 167.) As we explained: "[A]ny order or action of the Court which, without evident necessity, imposes physical burdens, pains and restraints upon a prisoner during the progress of his trial, inevitably tends to confuse and embarrass his mental faculties, and thereby materially to abridge and prejudicially affect his constitutional rights of defense . . . ." (*Id.* at p. 168.) The common law rule was also recognized by the California Legislature with the enactment in 1872 of section 688. That section, as amended, provides: "No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."

Thus, it was recognized early on that the use of shackles in court could prejudically affect the rights of the defendant, not just because of the impact they might have on the jury, but because of their unsettling effect on the defendant and consequently "his constitutional rights of defense." (*Harrington, supra,* 42 Cal. at p. 168.) More reccently, the United States Supreme Court has observed that "use of this [shackling] technique is itself something of an affront to the very dignity and decorum of judicial proceedings . . . ." (*Illinois* v. *Allen* (1970) 397 U.S. 337, 344 [25 L.Ed.2d 353, 359, 90 S.Ct. 1057].)

We reaffirmed our adherence to the *Harrington* rule, (*supra,* 42 Cal. 165) in the seminal case of *People* v. *Duran, supra,* 16 Cal.3d 282, where we stated: "We believe that possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand, all support our continued adherence to the *Harrington* rule." (*Id.* at p. 290.)

■ Although we have not previously considered the use of restraints in a preliminary hearing, the reasoning of *Harrington* and *Duran* leave no doubt that the same principles would apply in that setting. As we have noted, the *Harrington* rule of "evident necessity" serves not merely to insulate the jury from prejudice, but to maintain the composure and dignity of the individual accused, and to preserve respect for the judicial system as a whole; these are

paramount values to be preserved irrespective of whether a jury is present during the proceeding. Moreover, the unjustified use of restraints could, in a real sense, impair the ability of the defendant to communicate effectively with counsel (*People v. Harrington, supra,* 42 Cal. at p. 168), or influence witnesses at the preliminary hearing. Accordingly, we hold that, as at trial, shackling should not be employed at a preliminary hearing absent some showing of necessity for their use. Nevertheless, while the dangers of unwarranted shackling at the preliminary hearing are real, they are not as substantial as those presented during trial. Therefore, a lesser showing than that required at trial is appropriate.

■■■ No reasons for the shackling of defendant appear in the instant record. The trial court, as noted earlier, simply denied counsel's objection to the handcuffs and leg restraints without further inquiry. Therefore, we must conclude that it was an abuse of discretion to shackle defendant. (*People v. Duran, supra,* 16 Cal.3d at p. 293.)

The error does not, however, compel reversal. ■■■ "[I]rregularities in the preliminary examination procedures which are not jurisdictional in the fundamental sense shall be reviewed under the appropriate standard of prejudicial error and shall require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination." (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].)

■■■ As noted earlier, defendant claims that the physical restraints may have tainted the eyewitness identifications of defendant at the preliminary hearing. Only one witness, Trudy Allessie, positively identified defendant as the assailant. The record of the preliminary hearing, however, does not reveal whether she actually observed the restraints. Her testimony at trial suggests that she did not. On cross-examination, defense counsel asked Mrs. Allessie whether she recalled how defendant was dressed at the preliminary hearing. She responded, "I think he had orange overalls on." Counsel continued: "And he was handcuffed and shackled at the preliminary hearing, wasn't he?" She responded: "I don't know."

Furthermore, even assuming that Mrs. Allessie was aware of the shackles, she had previously identified defendant at both a photographic and a live line-up. There is no claim that either of these identifications was suggestive. Thus, the record refutes defendant's claim that the identification at the preliminary hearing was suggested by defendant's prison garb and shackles. Accordingly, we conclude that the error was not prejudicial to defendant.

### 6. *Hearsay Statements*

 Defendant next contends the trial court committed prejudicial error in admitting evidence of Trudy Allessie's statements to the police under the prior inconsistent statement exception to the hearsay rule. We disagree.

At trial, Mrs. Allessie was positive that she heard two shots fired after defendant left with her purse, but was uncertain about when the two shots occurred. Initially, she testified, "I know I heard one [shot] as he [i.e., defendant] went around the back of the truck. That's all I know." She then stated that she heard the first shot while she was still sitting in the truck. She could not be sure when she heard the second shot.

The prosecutor then introduced Mrs. Allessie's prior statements to Sergeant Turley and Deputy Sheriff McManus. McManus was the first officer at the scene and spoke with Mrs. Allessie within an hour after the shooting. Mrs. Allessie told him that several seconds after the suspect ran off, as she was leaving the truck, she heard two shots, "a pop followed by a louder pop." Turley also interviewed Mrs. Allessie following the shooting. She told Turley that she heard the shots after she had exited the truck.

Section 1235 of the Evidence Code makes admissible the prior inconsistent statement of a witness not only to impeach credibility but also to prove the truth of the matters stated. (*Clifton* v. *Ulis* (1976) 17 Cal.3d 99, 103-104 [130 Cal.Rptr. 155, 549 P.2d 1251]; *People* v. *Green* (1971) 3 Cal.3d 981, 985 [92 Cal.Rptr. 494, 479 P.2d 998].) However, because Mrs. Allessie could not remember when she heard the second shot, defendant contends that her prior statements were not "inconsistent" with her testimony, and therefore should not have been admitted into evidence.

 Generally it is true that the testimony of a witness indicating that he or she does not remember an event is not inconsistent with a prior statement describing the event. (*People* v. *Sam* (1969) 71 Cal.2d 194, 208-210 [77 Cal.Rptr. 804, 454 P.2d 700].) "But justice will not be promoted by a ritualistic invocation of this rule of evidence. Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness." (*People* v. *Green, supra,* 3 Cal.3d at p. 988; accord *Clifton* v. *Ulis, supra,* 17 Cal.3d at p. 104.)

 Mrs. Allessie's testimony at trial that she was still inside the truck when she heard the first shot directly contradicted her earlier statements to the police that she was outside and walking toward the rear of the truck

when the first shot rang out. Her contemporaneous statements suggested a longer period of time between defendant's departure and the first shot, which rebutted defendant's claim that although he might have been at the scene, he could not have shot the victim because he was still at the truck. Moreover, although she could not remember at trial when the second shot occurred, it was not error to admit the prior statements indicating that she heard two shots in rapid succession. ". . . *Sam* stands for no more than the proposition that 'prior statements are not admissible to impeach a witness whose answers to questions are *exclusively* of the "I-don't-remember" variety.'" (*Clifton* v. *Ulis*, *supra*, 17 Cal.3d at p. 104, original italics.) Viewed as a whole, Mrs. Allessie's trial testimony was inconsistent "in effect." (*People* v. *Green*, *supra*, 3 Cal.3d at p. 988.) Accordingly, the trial court did not err in admitting the prior statements.

 Defendant also claims that admitting the prior statements violated his right of confrontation as guaranteed by the Sixth Amendment. It is settled that admission of a witness's prior inconsistent statement to prove the truth of the matters asserted therein does not violate the confrontation clause provided that the statement was made by the declarant in testifying at the preliminary hearing, or the declarant testifies at trial. (*California* v. *Green* (1970) 399 U.S. 149, 158-159 [26 L.Ed.2d 489, 497, 90 S.Ct. 1930]; *People* v. *Bynum* (1971) 4 Cal.3d 589, 603 [94 Cal.Rptr. 241, 483 P.2d 1193].) Here, Mrs. Allessie testified at trial and was subject to full cross-examination. Hence, there was no violation of the confrontation clause.

### 7. *Photographs*

 Defendant contends he was prejudiced by the improper admission of several photographs of the victim and the crime scene taken shortly after the shooting. He asserts that the photographs were irrelevant, inflammatory and cumulative.

We disagree. The prosecution's theory at trial was that the killing was either perpetrated during the course of a robbery or was wilful, deliberate and premeditated. The photographs depicting the placement and nature of the wounds and powder burns clearly supported the prosecution's claim that defendant first shot the victim while the two were facing each other, and fired a second shot from close range into the victim's chest while the latter was lying helpless and prostrate on the ground. As we recently observed in *People* v. *Turner* (1990) 50 Cal.3d 668 [268 Cal Rptr. 706, 789 P.2d 887]: "The prosecution was not obliged to prove these details solely from the testimony of live witnesses, and the jury was entitled to see how the physical details of the scene and body supported the prosecution theory . . . ." (*Id.*

at p. 706; accord *People* v. *Kelly* (1990) 51 Cal.3d 931, 963 [275 Cal.Rptr. 160, 800 P.2d 516]; *People* v. *Melton* (1988) 44 Cal.3d 713, 741 [244 Cal.Rptr. 867, 750 P.2d 741].)

Nor was the probative value of the photographs outweighed by their prejudicial effect. Although " 'murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant' " (*People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91]), we have independently reviewed the photographs in question and conclude that they were not unduly gruesome or inflammatory. (*People* v. *Kelly, supra,* 51 Cal.3d at p. 963; *People* v. *Turner, supra,* 50 Cal.3d at p. 706.)

### 8. *Limiting of Defense Experts*

 ██ Defendant contends the trial court erred in ruling on the qualifications of two proposed defense experts in crime reconstruction and autopsy procedures. As explained below, the court's rulings were correct.

The prosecution attempted to portray the murder as a particularly vicious, execution-style slaying. The theory was based on the eyewitness testimony of Carol DiCenso, who observed the assailant fire two shots, the first while the victim was standing, the second while the victim was lying on the ground. Ms. DiCenso's account of the murder was corroborated by the testimony of Dr. Hunter, a pathologist who performed the autopsy on the victim. Dr. Hunter stated that the second bullet did not exit the victim's back but rather struck a hard, flat surface, i.e., the pavement. He further testified that the second bullet caused an "epithelial crush injury," which further indicated that the victim's back was pressed against a hard surface.

To rebut the foregoing testimony and demonstrate that the two shots were fired rapidly while the victim was still standing, the defense attempted to qualify David Duncan, a retired deputy sheriff, as "an expert in ballistics, firearms, examination of physical evidence and crime reconstruction based on physical evidence." Defendant also sought to qualify Jules Slaick, a licensed private investigator, as a crime scene reconstruction and ballistics expert. At the prosecutor's request, the trial court conducted an Evidence Code section 402 hearing to explore the nature of the proposed testimony and determine whether either witness was qualified as an expert.

At the hearing, Duncan testified that the absence of "mushrooming" damage on the nose of the bullet showed it had not hit a hard, flat surface but rather a bone within the body cavity. Duncan also stated that the autopsy procedures may have skewed the evidence of the bullet's trajectory, and that

a crush-type wound would have shown more discoloration than that found on the victim's back. Duncan's opinion was premised on his review of the autopsy records and his examination of the bullet.

On cross-examination, Duncan acknowledged that he had no training or background in pathology and had never previously testified as an expert in that field; he had never examined a bullet wound microscopically, conducted tests to determine the effects of a bullet on the human body or removed a bullet from a human body. Nor did he know the meaning of the term "epithelial crush injury."

The trial court allowed Duncan to testify as a ballistics expert based on his previous experience examining spent projectiles, but determined that Duncan was not qualified to give medical testimony concerning the nature of the victim's injuries or the trajectory pattern of the bullet.

Although one need not necessarily be a licensed physician to give a medical opinion (*People* v. *Villareal* (1985) 173 Cal.App.3d 1136, 1142 [219 Cal.Rptr. 371]), here it is evident that Duncan was totally deficient in the requisite background, training or experience to state an opinion on the nature or cause of the victim's wounds. The trial court plainly did not abuse its discretion in limiting Duncan's testimony to ballistic evidence. (*People* v. *Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372].)

Defendant also attempted to qualify Jules Slaick, a licensed private investigator, as an expert in ballistics and crime scene reconstruction. Slaick proposed to testify that, based on his observations of the physical evidence, he believed the victim was standing or lunging forward when both shots were fired. He disagreed with Dr. Hunter's conclusion that the crush-type injuries to the victim's back where the bullet tried to exit were caused by a hard surface. Slaick acknowledged that he had no training in pathology and had never attended an autopsy. Slaick's experience in accident reconstruction was based on his military service 20 years earlier, when he took photographs of plane and car crashes. He had never photographed a crime scene involving a gunshot death. His opinion regarding the effect of the bullets on the victim's body was based on his viewing of documentary films of men in combat. His purported ballistics expertise was based on his own reading and experience with guns; he had no formal training in ballistics and was not familiar with the term "epithelial crush injury."

The trial court found that Slaick had not demonstrated an expertise in either crime reconstruction or ballistics, and limited his testimony to his observations of the crime scene. The court's ruling was plainly correct. By

his own admission, Slaick had no background, experience or training in pathology or ballistics. There was no abuse of discretion. (*People* v. *Chavez*, *supra*, 39 Cal.3d at p. 828.)

### 9. *Firearm Enhancement*

██ Defendant next contends that the gun use finding (§ 12022.5) should be stricken as to count 3, the robbery of Trudy Allessie, because there was no showing that defendant displayed or personally used a gun in the commission of the robbery.

To recall, the evidence showed that defendant appeared at the passenger side of the victim's truck and demanded money from the victim's wife, Trudy Allessie. Mrs. Allessie opened her purse and handed defendant a bundle of currency. Defendant then grabbed the purse and ran toward the rear of the truck. Moments later, a passing motorist, Carol DiCenso, observed an individual dressed like defendant point a gun at the murder victim, Sam Allessie. She heard a shot and saw a gun blast. The victim slumped to his knees and fell over. DiCenso observed the assailant straddle the victim's body, aim and fire another shot into the victim. After the second shot, the shooter bent over and reached underneath the body of the victim. He then stood up and ran toward a car which had its lights on and was parked in the lot of a nearby cafe. Shortly before the incident, Mrs. Allessie observed Sam check his wallet, which he habitually kept in his rear pants pocket.

It is undisputed that Ms. Allessie did not see defendant display a gun when he robbed her. Nevertheless, the prosecutor argued that defendant's use of a gun, moments later, to rob and murder her husband, Sam Allessie, facilitated the robbery of Trudy by preventing Sam from pursuing or identifying defendant. The prosecutor argued, and the jury was instructed, that a robbery is not complete until the perpetrator has reached a place of temporary safety. Accordingly, the prosecutor argued, and the jury found, that defendant personally used a firearm "in the commission" of the robbery of Trudy. (§ 12022.5, subd. (a).)

██ In construing the words of a statute, a reviewing court is required to read the statute in the light of the legislative objective sought to be achieved, and the evil to be averted. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].) ██ The intent of the Legislature in enacting the firearm use enhancement of section 12022.5 was "to deter the use of firearms in the commission of violent crimes by prescribing additional punishment for each use." *(People* v. *White* (1976) 16 Cal.3d 791, 795 [129 Cal.Rptr. 769, 549 P.2d 537]; accord *People* v. *Chambers* (1972) 7 Cal.3d

666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024].) In light of the legislative purpose to discourage the use of firearms, it would appear to be immaterial whether the gun use occurred during the actual taking or against the actual victim, so long as it occurred "in the commission" of the robbery. (§ 12022.5, subd. (a).)

 "[I]t is settled that the crime of robbery is not confined to the act of taking property from victims. The nature of the crime is such that a robber's escape with his loot is just as important to the execution of the crime as obtaining possession of the loot in the first place. Thus, the crime of robbery is not complete until the robber has won his way to a place of temporary safety." (*People* v. *Carroll* (1970) 1 Cal.3d 581, 585 [83 Cal.Rptr. 176, 463 P.2d 400]; accord *People* v. *Milan* (1973) 9 Cal.3d 185, 195 [107 Cal.Rptr. 68, 507 P.2d 956].) Moreover, the traditional "escape rule" has been applied to define the duration of robbery in the context of numerous statutes defining the ancillary consequences of robbery. (See, e.g., *People* v. *Salas* (1972) 7 Cal.3d 812, 823-824 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832] [felony murder]; *People* v. *Laursen* (1972) 8 Cal.3d 192 [104 Cal.Rptr. 425, 501 P.2d 1145] [kidnapping committed during escape from robbery is kidnapping "to commit robbery" under section 209]; *People* v. *Carroll, supra,* 1 Cal.3d 581 [injury inflicted on a robbery victim after the taking and asportation but during the robber's escape is "in the course of commission of the robbery" for purposes of the great bodily injury enhancement of former section 213].)

*Carroll, supra,* 1 Cal.3d 581, and *Laursen, supra,* 8 Cal.3d 192, are particularly noteworthy for our purposes here. The former involved an enhancement statute (great bodily injury "in the course of commission of the robbery") which, like the gun use enhancement of section 12022.5, was plainly intended to deter conduct which increased the risk of physical injury to the victim of a felony. Similarly, in *Laursen, supra,* 8 Cal.3d 192, "we recognized that the escape rule served public policy because the primary purpose of the kidnapping-to-commit-robbery statute is to impose harsher criminal sanctions to deter activity that substantially increases the risk of harm." (*People* v. *Cooper* (1991) 53 Cal.3d 1158, 1167-1168 [282 Cal.Rptr. 450, 811 P.2d 742].)[16]

 Applying these principles to the case at bar, we conclude that the facts are sufficient to support a finding that defendant personally used a

---

[16]In *People* v. *Cooper, supra,* 53 Cal.3d 1158, we held that, for purposes of aider and abettor liability, a robbery continues as long as the loot is being carried away to a place of temporary safety. We declined to adopt the traditional escape rule because the same policy considerations of deterrence do not apply in the aider and abettor context if the defendant, in that case the getaway driver, was unaware of the robbery until all acts constituting the robbery, including the asportation, had ceased. "Thus, in determining liability as an aider and

firearm in the commission of the robbery of Trudy Allessie. As the prosecutor argued, the jury could reasonably have inferred that defendant used the gun against the murder victim to facilitate his escape or to prevent his identification as the robber of Trudy Allessie. The gun use enhancement was properly imposed.

## B. *Special Circumstance Claims*

### 1. *Intent to Kill*

Defendant claims that the jury was not properly instructed as to the requisite intent in connection with the special circumstance allegation. ▮ The Attorney General responds that any error is harmless under *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], which overruled *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in holding that intent to kill must be charged and proved for a felony-murder special circumstance only where the defendant was an aider and abettor to the homicide and not the actual killer. (43 Cal.3d at pp. 1138-1147.) Here the evidence showed, and the jury expressly found, that defendant actually fired the shots which killed the victim.

To be sure, we have held that retroactive application of *Anderson* to pre-*Carlos* crimes does not violate due process because the statute was "ambiguous" and provided ample "pre-*Carlos* foreseeability of a holding that such intent is not required for the actual killer." (*People* v. *Poggi* (1988) 45 Cal.3d 306, 326-327 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People* v. *Whitt* (1990) 51 Cal.3d 620, 637-638 [274 Cal.Rptr. 252, 798 P.2d 849].) However, defendant's crimes were committed in the four-year "window" period between *Carlos* and *Anderson*. Retroactive application of *Anderson* in these circumstances would deprive defendant of a defense against imposition of the death penalty which the law at the time of the crime plainly permitted. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 973 [281 Cal.Rptr. 273, 810 P.2d 131]; *In re Baert* (1988) 205 Cal.App.3d 514, 521-522 [252 Cal.Rptr. 418], cert. den. *sub nom. California* v. *Baert* (1989) 492 U.S. 918 [106 L.Ed.2d 589, 109 S.Ct. 3242].) Thus we must address defendant's claim on its merits.

▮ Defendant contends that because the jury was separately instructed in connection with the robbery-murder special circumstance that they must find an intent to kill if defendant was an accomplice or an aider and

---

abettor, the focus must be on the acts constituting the robbery, not the escape." (*Id.* at p. 1168.)

abettor,[17] and was further instructed—at defendant's request—to determine whether defendant was the actual killer or merely an accomplice, they may have inferred that intent to kill was *not* a requirement if defendant was the actual killer.

The argument lacks merit. The jury was instructed that the special circumstance allegation required findings that the murder was committed while defendant "*was engaged in or was an accomplice* in the commission or attempted commission of a robbery . . . ; [and] that the defendant *intended to kill a human being or intended to aid another in the killing of a human being.*" (Italics added.) In summarizing the special finding forms for the jury, the trial court underscored the intent-to-kill requirement in connection with the special circumstance allegation, making *no* distinction between liability as the actual killer or as an accomplice: "You are going to be asked to make a finding as to whether or not the special circumstance allegation is true; that is, that the murder was committed during the course of the robbery *with the specific intent to kill the alleged victim.*" (Italics added.)

The prosecutor's argument reinforced the trial court's instruction that the jury must find "that defendant intended to kill a human being or intended to aid another in the killing of a human being . . . ." Moreover, defense counsel made clear in his argument that he had requested the special verdict simply to focus the jury's attention on the intent requirement: "You would want to know in your own mind what you have decided as to who the killer was before you make that special circumstance finding." Nothing in the argument of counsel suggested to the jury that intent to kill was not a requirement if they found that defendant was the actual killer.

Accordingly, we perceive no reasonable possibility that the jury was misled with respect to the elements of the special circumstance allegation. (*People* v. *Duncan, supra,* 53 Cal.3d at p. 974.)

### 2. *Motion for Bifurcated Trials*

Prior to the commencement of trial, defendant moved to bifurcate trial of the guilt phase and the special circumstance allegation. Relying on *People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th], defendant claimed that a separate trial was necessary because his defense that he was not present at the scene of the crimes was inconsistent

---

[17]The instruction in question stated: "If the defendant . . . was an accomplice or aider and abettor, but not the actual killer, it must be proved beyond a reasonable doubt that he intended to aid in the killing of a human being before you are permitted to find that alleged special circumstance . . . to be true as to the defendant . . . ."

with his defense to the special circumstance allegation that, although present, he did not have the requisite intent to kill.[18] The trial court denied the motion.

The court's ruling was correct. The statutory scheme plainly contemplates that, except where the special circumstance alleged is that of a prior murder, the same jury which determines guilt shall also at the same time determine the truth of the special circumstance allegation: "The question of the defendant's guilt shall first be determined. If the trier of fact finds the defendant guilty of first degree murder, it shall *at the same time* determine the truth of all special circumstances charged . . . except . . . where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree." (§ 190.1, subd. (a), italics added.)

Defendant's reliance on *People* v. *Bigelow, supra,* 37 Cal.3d 731, is misplaced. In that case, one of the special circumstance allegations was murder for the purpose of avoiding arrest or perfecting an escape. (§ 190.2, subd. (a)(5).) At the guilt phase the prosecution presented evidence highly prejudicial to the defendant, indicating that he had committed a dozen uncharged burglaries, robberies and thefts; the prosecution's primary theory of relevance was that the defendant committed each of the crimes to finance and perpetuate an escape from custody, which was relevant to the special circumstance allegation. Because of the "highly prejudicial" nature of the prior-crimes evidence, we concluded that the trial court should have conducted a separate trial of the special circumstance allegation. (37 Cal.3d at pp. 747-748.)

The facts of the present case are not even remotely similar to those in *Bigelow.* No evidence was presented to the jury during the guilt phase which could be characterized as so "highly prejudicial" (*Bigelow, supra,* 37 Cal.3d at p. 748) that the jury's ability to render a fair and impartial verdict on the special circumstance allegation would be impaired. *People* v. *Velasquez* (1980) 26 Cal.3d 425 [162 Cal.Rptr. 306, 606 P.2d 341], on which defendant

---

[18]Defendant requested only a separate *trial*; he did not ask to impanel separate juries for the guilt phase and special circumstance allegation. In his briefs, defendant implies that he also requested separate guilt and penalty phase juries on the ground that inconsistent defenses would deprive him of a fair trial. In fact, the latter request was based exclusively on *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]; defendant argued that death qualification of the jury would result in a guilt-prone jury. The trial court denied the *Hovey* motion; defendant does not challenge that ruling on appeal.

relies, is equally inapposite.[19] There we approved the procedure, contemplated by section 190.1, subdivision (a), of bifurcating the guilt and special circumstance trials where the special circumstance allegation was that of a prior murder. Obviously that was not the case here.

Defendant also relies on section 190.4, subdivision (c), which provides that the same jury which determines guilt shall also consider any plea of not guilty by reason of insanity, the truth of any special circumstance allegation, and the penalty to be applied, "unless for good cause shown the court discharges that jury in which case a new jury shall be drawn." As noted earlier, however, defendant did not seek to have a new jury empaneled to hear the special circumstance allegation; he sought only to have the trial bifurcated and the issue tried before the same jury. Thus, even if defendant had shown good cause, under the terms of section 190.4, subdivision (c) (which he did not invoke at trial), he would not have been entitled to the relief requested.

C. *Penalty Phase Issues*

1. *Prior-crimes Evidence*

Defendant contends the trial court erred in permitting the prosecutor to present testimony describing the circumstances of his 1982 burglary and evidence of his conviction of the same offense.

Defendant argues that evidence of the 1982 burglary was admissible as either violent criminal activity under section 190.3, factor (b), or a prior felony conviction pursuant to section 190.3, factor (c), but not both. We have rejected this claim on numerous occasions. (See *People v. Wright* (1990) 52 Cal.3d 367, 432 [276 Cal.Rptr. 731, 802 P.2d 221]; *People v. Benson, supra,* 52 Cal.3d at p. 788; *People v. Karis* (1988) 46 Cal.3d 612, 640 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People v. Melton, supra,* 44 Cal.3d at pp. 764-765.) As we explained recently in *Benson:* "The People may, of course, seek to prove both the fact of prior felony convictions and any underlying criminal activity involving the use or threat of force or violence." (52 Cal.3d at pp. 787-788.)

Defendant also complains that the trial court erred in admitting evidence of criminal conduct which went beyond the parameters of his 1982 conviction. Defendant was charged with burglary (§ 459), use of a deadly

---

[19]*People v. Velasquez, supra,* 26 Cal.3d 425, was vacated by the United States Supreme court and subsequently reinstated in its entirety in *People v. Velasquez* (1980) 28 Cal.3d 461 [171 Cal.Rptr. 507, 622 P.2d 952].

weapon (§ 12022, subd. (b)), infliction of great bodily injury (§ 12022.7) and one count of cruelty to animals (§ 597, subd. (a)). Pursuant to a plea bargain, he pled guilty to felony burglary and admitted the weapon use, in exchange for which the remaining counts and allegations were dismissed. Testimony at the penalty phase, however, showed that during the course of the burglary defendant assaulted and inflicted serious bodily injury on the victim.

We have consistently rejected the contention that evidence relating to prior violent activity is strictly confined to the circumstances demonstrating the prior felony conviction. (See *People* v. *Wright, supra,* 52 Cal.3d at p. 432; *People* v. *Melton, supra,* 44 Cal.3d at p. 764; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301].) As we stated in *People* v. *Robertson* (1989) 48 Cal.3d 18 [255 Cal.Rptr. 631, 767 P.2d 1109]: " 'When dealing with violent conduct it is not the *fact* of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense.' (Italics in original.) Hence, the statute permits the introduction of all evidence of violent crimes whether or not they resulted in a conviction, except those of which the defendant has been acquitted." (*Id.* at p. 47, quoting *People* v. *Gates, supra,* 43 Cal.3d at p. 1203.)

Defendant also claims that the court erred in admitting evidence of damage to the burglary victim's house because it did not demonstrate the presence of criminal activity involving the use of force or violence. (§ 190.3, factor (b).) The contention lacks merit. As we recently explained in *People* v. *Cooper, supra,* 53 Cal.3d 771: "[A]ll crimes committed during a continuous course of criminal activity which includes the use of force or violence may be considered in aggravation even if some portions thereof, in isolation, may be nonviolent." (*Id.* at p. 841.)

Relying on *People* v. *Harvey* (1979) 25 Cal.3d 754 [159 Cal.Rptr. 696, 602 P.2d 396], defendant next contends that admitting evidence relating to the dismissed counts violated the terms of the plea bargain. We have rejected the identical contention in prior decisions. (See *People* v. *Heishman, supra,* 45 Cal.3d at p. 193; *People* v. *Taylor* (1990) 52 Cal.3d 719, 743 [276 Cal.Rptr. 391, 801 P.2d 1142].)

Defendant further asserts that use of the evidence relating to the prior offenses placed him in double jeopardy. The contention lacks merit. In presenting testimony relating to defendant's use of force or violence, the prosecutor was not relitigating the prior acts for purposes of obtaining a new conviction but rather for their relevance as an aggravating factor. We have held that principles of double jeopardy have no application under these circumstances. (*People* v. *McDowell* (1988) 46 Cal.3d 551, 568 [250

Cal.Rptr. 530, 758 P.2d 1060] ["Defendant was not placed twice in jeopardy for the same offense; rather, evidence of the offense was admitted to assist the jury in its determination of the appropriate sentence."].) Defendant's claim that "relitigation" of the 1982 burglary as part of the penalty phase violated his right to speedy trial is similarly without merit. (*Ibid.*)

Finally, defendant asserts that admitting the evidence of the circumstances underlying the prior conviction violated his rights to due process of law (U.S. Const., Amends. V, XIV), equal protection of the laws (*id.,* Amend. XIV), freedom from an impermissible risk of arbitrary and capricious decisionmaking (*id.,* Amends. VIII, XIV), and reliable penalty determination (*ibid.*). We have previously rejected each of these claims. As we stated in *People* v. *Benson, supra,* 52 Cal.3d 754: "We are not persuaded that the admission of such evidence—in this particular case or generally—affects, in any constitutionally significant way, the fairness of the proceedings, the treatment of 'similarly situated' defendants, the risk of arbitrary and capricious decisionmaking, or the reliability of the outcome. [Citations.]" (*Id.* at p. 789.) Defendant was not denied his right to due process and a fair trial.

### 2. *Prosecutorial Misconduct*

At the guilt phase of trial the prosecutor called defendant's wife, Laura Fierro, as a witness. In front of the jury, she invoked her privilege against self-incrimination. The prosecutor elected not to proceed with the examination. Thereafter, during cross-examination of Laura Fierro at the penalty phase, the prosecutor asked her whether she had lied to the police to protect defendant.

Defendant now claims that the prosecutor, with knowledge of Laura Fierro's intention not to testify, committed misconduct by forcing her to claim a testimonial privilege in front of the jury. The result, he asserts, was to impeach unfairly her credibility as a witness at the penalty phase. Defendant also argues that the prosecutor's cross-examination of Ms. Fierro was abusive and constituted misconduct.

Neither contention is persuasive. To be sure, a prosecutor may not make "a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." (*Namet* v. *United States* (1963) 373 U.S. 179, 186 [10 L.Ed.2d 278, 283, 83 S.Ct. 1151].) And it has been held to be improper to permit a witness to claim a testimonial privilege in front of the jury where the witness's intention not to testify is known beforehand. (*United States* v. *Chapman* (11th Cir. 1989) 866 F.2d 1326,

1333.) We have recently approved the procedure whereby the Fifth Amendment claim may be asserted in a pretestimonial hearing outside the presence of the jury. (*People* v. *Frierson* (1991) 53 Cal.3d 730, 743 [280 Cal.Rptr. 440, 808 P.2d 1197]; *People* v. *Ford* (1988) 45 Cal.3d 431, 441, fn. 6 [247 Cal.Rptr. 121, 754 P.2d 168, 76 A.L.R.4th 785].)

■■■■ However, there is no evidence that the prosecutor here improperly exploited Ms. Fierro's refusal to testify, and the record does not substantiate defendant's claim that her intention was known beforehand. Prior to trial, the prosecutor informed the court and counsel that he had subpoenaed Ms. Fierro as a witness for the People. Defendant asserted the spousal privilege under Evidence Code section 971. At a hearing to determine the applicability of the privilege, the prosecutor indicated that Ms. Fierro would testify about her relationship with defendant, the type of clothes he wore, his employment status, the amount of money he had, his ownership of an AMC Pacer and his whereabouts on the night of the crime. The trial court ruled that the spousal privilege was inapplicable under Evidence Code section 972, subdivision (f), and allowed the prosecutor to call the witness and question her on the matters set forth in his offer of proof.[20]

At trial, Laura Fierro invoked her privilege against self-incrimination immediately upon taking the stand. The trial court thereupon dismissed the jury and the prosecutor informed the court that he had not anticipated the witness's action. After a short recess, the trial court recalled the jury, informed them of the district attorney's intention not to recall Ms. Fierro as a witness, and admonished them not to draw any inferences as to the credibility of the witness or as to the guilt or innocence of defendant based on her refusal to testify.

Apart from her unsuccessful attempt to claim a spousal privilege, nothing in the record indicates that the prosecutor knew beforehand of the witness's intention to claim a testimonial privilege. Moreover, the prosecutor made no attempt to exploit the situation to his advantage by asking follow-up questions and forcing the witness to claim the privilege after each question. (See *People* v. *Ford, supra,* 45 Cal.3d at pp. 440-441.) Furthermore, the trial court immediately admonished the jury not to draw any inferences with respect to

---

[20]Evidence Code section 972, subdivision (f) makes the spousal privilege inapplicable in "A proceeding resulting from a criminal act which occurred prior to legal marriage of the spouses to each other regarding knowledge acquired prior to that marriage if prior to the legal marriage the witness spouse was aware that his or her spouse had been arrested for or had been formally charged with the crime or crimes about which the spouse is called to testify."

At the hearing, Ms. Fierro testified that she was not married to defendant at the time of the crimes in January 1985, and that she was aware defendant had been arrested for robbery and murder and formally charged with those crimes when she married him in December 1985.

Ms. Fierro's credibility or defendant's guilt or innocence. Accordingly, we find no basis to conclude the prosecutor committed misconduct in calling the witness to testify at the guilt phase.

 Nor does the record support defendant's claim that the prosecutor improperly cross-examined Ms. Fierro at the penalty phase. His questions as to whether she had lied to the police when she told them that defendant did not live with her and did not keep any belongings at her home were within the proper scope of impeachment to show bias and untruthfulness. (Evid. Code, § 780, subds. (e), (k).) His questions as to whether she had received welfare while defendant was living with her and whether defendant had borrowed money from her were admissible to impeach Ms. Fierro's testimony that defendant was supporting the family. Accordingly, the claim of prosecutorial misconduct must fail.

### 3. *Victim Impact Evidence*

 Relying on *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207], defendant asserts the prosecutor improperly referred to the victim's status in the community and the impact of the crimes on the victim's wife.

The comments in question were made in the context of the prosecutor's description of the circumstances of the killing, which he argued should be considered as a factor in aggravation. The statement in full was as follows (the specific remarks to which defendant objects are italicized): "So the first thing that you can consider is the actual crime, . . . murder during the course of those robberies. That's one of the aggravating factors that you will have to deal with. [¶] And I submit to you, ladies and gentlemen, that this is an incredibly vicious, an incredibly cold-blooded murder. It is a murder that was motivated by greed during a robbery, it is a murder that's motivated by an absolute abject viciousness. [¶] It is a murder that is, in plain and brutal terms, an execution. This is not a killing that is done in the heat of some passion, done by a person who has lost control of their senses because of emotional or social trauma. This is not a spur of the moment thing. [¶] This is a brutal killing done in the robbery of two totally innocent people. It is an execution [in] which the victim in this case was shot, and then was shot again, and literally left to die in a pool of his own blood *in front of his wife of 50 years who was so traumatized, who was under so much pain at the time, that she could not even go over to her husband and do anything to assist. [¶] That, ladies and gentlemen, is something that this woman will live with for the rest of her life. That man died on the sidewalk right next to the business that*

*he'd owned for 40 years*, and there was no reason for that killing. This wasn't necessary. [¶] Mr. Fierro had already gotten his money. He'd already stolen the purse of a defenseless woman, he was ready to get away with his ill-gotten gains. There was no justification for simply brutally murdering Sam Allessie, for executing him. That is a grossly offensive crime. [¶] That crime stretches the concept of humanity. A person who commits that sort of senseless, brutal killing starts to forfeit the definition of being a human being. [¶] . . . That's the key factor in your decision of whether to impose death or whether to impose life without the possibility of parole. That crime, his behavior in committing the offenses that you found him guilty of committing. That is a heinous crime, that crime is a gross, aggravating factor in this case."

During the pendency of this appeal, the United States Supreme Court partially overruled its holdings in *Booth* and *Gathers*, concluding that the use of victim impact evidence does not offend the Eight Amendment guaranty of an individualized penalty assessment in a capital trial. (*Payne* v. *Tennessee* (1991) 501 U.S. ___ [115 L.Ed.2d 720, 111 S.Ct. 2597].) Moreover, we have since held that evidence of the specific harm caused by the defendant is admissible under California law (§ 190.3, factor (a)) as one of the "circumstances of the crime of which the defendant was convicted in the present proceeding . . . ." (*People* v. *Edwards* (1991) 54 Cal.3d 787, 833-836 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

The prosecutor's remarks here plainly fall within this category. His reference to the fact that the victim was brutally gunned down in front of his wife was a simple statement of fact concerning the circumstances of the crime. (*People* v. *Stankewitz, supra,* 51 Cal.3d at p. 111.) His notation that the victim's wife witnessed the killing and must live with the memory was equally pertinent to the circumstances of the offense and its obvious effect on Mrs. Allessie. The same conclusion applies to the comment that the victim was killed in front of the business that he had owned for 40 years. The statement simply describes a factual circumstance of the crime. (*Ibid.*) Furthermore, none of the remarks was so inflammatory as to divert the jury's attention from its proper role or invite an irrational response. (*People* v. *Edwards, supra,* 54 Cal.3d at p. 836.) Accordingly, we find no error.

Defendant objects on the same grounds to the following statement by the prosecutor: "It has been so long since we spoke about Sam Allessie, we have heard so much in the last few days about David Fierro, I want you think about Sam Allessie. I want you to think a little bit about your own family and your own friends, your own neighbors, your own fellow members of society. I want you to think about people like Tim Deno and Sam Allessie,

those kinds of peoples [*sic*] in your lives and my life and the lives of all of our society." Again, to the extent that the remarks could be construed as a positive reference to the status of the victim and the effect of his loss on friends, loved ones and the community as a whole, they were properly admitted under *Payne v. Tennessee, supra,* 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597], and section 190.3, factor (a).

### 4. Cross-examination Concerning Gang Affiliation

 Defendant next contends the trial court committed prejudicial error by permitting the prosecutor to ask questions of defendant's mother, Dolores Fierro, implying that defendant was a member of a youth gang. He contends the questions were irrelevant, exceeded the proper scope of rebuttal, were more prejudicial than probative, and violated his constitutional rights to confrontation and due process of law.[21]

Defendant's mother testified about his family background, relationship with his parents and siblings, educational difficulties and extracurricular activities. She stated that defendant often helped his neighbors with yard work, played Little League baseball, acted in school plays and accompanied his family on picnics; she indicated that defendant was well behaved, was close to his brothers and sisters, and was loved by his wife and children.

Thereafter, the trial court ordered an in-chambers hearing to address defense objections to several areas of the prosecutor's cross-examination of Dolores Fierro.[22] Counsel argued, inter alia, that questions concerning defendant's alleged membership in street gangs were irrelevant and beyond the scope of the direct examination. The prosecutor responded that he was prepared to have several detectives from the Fontana Police Department testify that defendant was a member of two Latino street gangs. Furthermore, the prosecutor observed that Mrs. Fierro had testified generally to defendant's good character and specifically had mentioned his participation in such wholesome activities as Little League and school plays. The prosecutor

---

[21]Defendant also makes reference to a portion of the prosecutor's cross-examination of Mrs. Cervantez, defendant's aunt. The prosecutor asked the witness whether it was true that defendant's purported reluctance to have his friends and family testify on his behalf was because it was not considered "macho" among defendant's "associates." The witness rejected the prosecutor's suggestion. Contrary to defendant's assertion, we do not believe the prosecutor's remarks constituted a sufficiently explicit reference to gang membership to warrant analysis.

[22]In addition to question about defendant's membership in street gangs, counsel objected to questions implying that several of defendant's brothers had been or were currently incarcerated, as well as questions relating to defendant's juvenile adjudications. The court excluded the latter two items but, as noted above, permitted the prosecutor to examine Mrs. Fierro with respect to the gang issue.

argued that he was entitled to rebut such testimony by inquiring into defendant's participation in youth gangs.

The trial court overruled defendant's objection. The prosecutor thereupon questioned Dolores Fierro concerning defendant's membership in two "street clubs." Mrs. Fierro denied, however, that defendant was ever a member of a club based in Fontana called "South Fontana" or "South Fonta" and further denied that a tattoo on defendant's arm signified his membership in that group; she also denied having seen similar tattoos on defendant's friends, and disclaimed any knowledge of a group called "Junior Chingones."

The trial court's decision to allow the cross-examination was correct. Under *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782] evidence not falling within one of the enumerated statutory factors in aggravation is inadmissible. However, as we noted in *Boyd*, "Once the defense has presented evidence of circumstances admissible under factor (k), . . . prosecution rebuttal evidence would be admissible as evidence tending to 'disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (*Id.* at p. 776.) As we subsequently explained in *People* v. *Rodriguez* (1986) 42 Cal.3d 730 [230 Cal.Rptr. 667, 726 P.2d 113], a defendant who introduces good character evidence widens the scope of the bad character evidence that may be introduced in rebuttal. "The theory for permitting such rebuttal evidence and argument is not that it proves a statutory aggravating factor, but that it *undermines* defendant's claim that his *good* character weighs in favor of mercy. Accordingly, the prosecutor, when making such a rebuttal effort, is not bound by the listed aggravating factors or by his statutory pretrial notice of aggravating evidence. (§ 190.3.)" (*Id.* at p. 791, italics in original; see also *People* v. *Daniels* (1991) 52 Cal.3d 815, 882-883 [277 Cal.Rptr. 122, 802 P.2d 906]; *People* v. *Burton* (1989) 48 Cal.3d 843, 860 [258 Cal.Rptr. 184, 771 P.2d 1270].)

The circumstances here are similar to those in *People* v. *Rodriguez, supra,* 42 Cal.3d 730, where we held that the prosecutor could properly refer in closing argument to prior criminal conduct which had not been admitted as evidence in aggravation under section 190.3. As we explained: "[A]ppellant offered substantial evidence and argument that he was a kind, loving, contributive member of his community, regarded with affection by neighbors and family. Once appellant placed his general character in issue, the prosecutor was entitled to rebut with evidence or argument suggesting a more balanced picture of his personality." (42 Cal.3d at p. 791.) To be sure, we cautioned in *Rodriguez* that "good character" evidence does not open to door to any evidence the prosecution can dredge up. "As in other cases, the scope

of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf." (*Id.* at p. 792, fn. 24.)

The prosecutor's cross-examination here satisfied these requirements. The witness had testified generally to defendant's good character and offered specific examples of his socially useful activities, including participation in Little League and school plays. The prosecution was entitled to present "a more balanced picture." (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 791.) Membership in youth gangs was relevant to the issue of defendant's character and activities as a youth and specifically rebutted the direct testimony of the witness. Accordingly, the cross-examination constituted proper rebuttal.

Defendant also asserts that the trial court failed to expressly weigh the probative value versus the potential prejudicial effect. (See Evid. Code, § 352; *People* v. *Green, supra,* 27 Cal.3d at p. 25.) Contrary to defendant's assertion, however, the record does not show an objection on these grounds to this line of questioning.[23] Accordingly, the trial court was not obligated to make such an explicit ruling. (*People* v. *Anderson* (1990) 52 Cal.3d 453, 477 [276 Cal.Rptr. 356, 801 P.2d 1107].) The same infirmity inheres in defendant's claim that the prosecutor's cross-examination violated his rights to due process and confrontation. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.)

### 5. *Cross-examination of Defense Witnesses*

Defendant alleges several additional instances in which the prosecutor's cross-examination of defense witnesses exceeded the scope of direct examination or introduced inadmissible evidence of defendant's bad character and prior criminality.

Defendant's aunt, Mrs. Cervantez, testified about defendant's upbringing. She observed, inter alia, that defendant "never was disrespectful" and that he "would never hurt anybody." During cross-examination, the prosecutor asked if the witness was "aware of . . . [defendant's] involvement with law enforcement officers in Fontana through his growing up years?" The witness responded that she was. Counsel thereupon objected and the discussion was continued in chambers. Counsel argued that the question exceeded the scope of direct examination and was improper impeachment at the penalty phase. The prosecutor responded that counsel had opened the

---

[23]Defendant raised an Evidence Code section 352 objection to questions implying that defendant's brothers were or had recently been incarcerated. Counsel specifically limited his objection to that line of questioning.

door to such impeachment by eliciting good character evidence. The court sustained the objection in chambers outside the presence of the jury.

Although the objection was sustained, we perceive no error in the prosecutor's cross-examination. We have previously observed that such impeachment is permissible when character testimony is introduced at the penalty phase. ▉ As we observed in *People* v. *Siripongs* (1988) 45 Cal.3d 548 [247 Cal.Rptr. 729, 754 P.2d 1306]: "It is well established that, '[w]hen a defense witness, other than the defendant himself, has testified to the reputation of the accused, the prosecution may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness' testimony.' (*People* v. *Wagner* (1975) 13 Cal.3d 612, 619 [119 Cal.Rptr. 457, 532 P.2d 105].) So long as the People have a good faith belief that the acts or conduct about which they wish to inquire actually took place, they may so inquire." (*Id.* at p. 578.) Thus, we "reject[ed] defendant's claim that cross-examination under Evidence Code section 1102 is impermissible at the penalty phase whenever character testimony is introduced in mitigation rather than to show conformity with a particular character trait. A defendant has no right to mislead the jury through one-sided character testimony during either the guilt or penalty trial. We do not believe that defendant was entitled to elicit testimony suggesting that he was honest, and at the same time to preclude the People from introducing contrary evidence." (*Ibid.*)

▉ Here, similarly, defendant was not entitled to elicit testimony that he was a "respectful" youth who "would never hurt anybody," and preclude cross-examination as to whether the witness was aware of conduct by the defendant inconsistent with the witness's testimony. Defendant does not contend the prosecutor lacked a good faith belief that the conduct of which he inquired actually took place. (*People* v. *Wagner* (1975) 13 Cal.3d 612, 619 [119 Cal.Rptr. 457, 532 P.2d 105].) Therefore, the cross-examination was appropriate.

▉ Defendant also claims the prosecutor impermissibly cross-examined defendant's sister, Theresa Sanchez, about certain prior bad acts of defendant. Ms. Sanchez testified on direct that defendant "was incapable of killing a person." On cross-examination, she stated that she had never seen defendant violent and denied any awareness of violence in his past. Counsel objected that the questions were argumentative but interposed no objection on the ground that they exceeded the scope of direct. Accordingly, the issue is not cognizable on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.) Moreover, for the reasons stated earlier, the prosecutor was entitled to inquire of the witness whether she was aware of conduct by the defendant

inconsistent with the witness's testimony. (*People* v. *Siripongs, supra,* 45 Cal.3d at p. 578.)

■ Defendant also complains that the prosecutor exceeded the scope of direct testimony and insinuated that defendant was a bad person by inquiring of Ms. Sanchez whether it was true that defendant did not get along with his brother Rey and sister Tina. Defendant failed to object to the question at trial; accordingly, the issue is waived on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.) ■ The prosecutor also asked Ms. Sanchez whether it was true that defendant was seeing other women before he married Laura Fierro, and whether defendant's placement in special education classes was based on truancy and disciplinary problems at school. In each instance the witness denied that the prosecutor's assertion was true. Both questions constituted proper rebuttal to testimony elicited on direct examination. Moreover, the court admonished the jury that a question is not evidence. Accordingly, we do not believe the questions prejudicially affected the verdict.

■ On cross-examination of defendant's aunt, Mrs. Cervantez, and defendant's wife, Laura Fierro, the prosecutor asked whether it was true that defendant failed to provide financial support for his family; the prosecutor also inquired of Laura Fierro whether it was true that the family was receiving welfare benefits while defendant was living with them. Defendant contends the questions were irrelevant and exceeded the scope of direct testimony. The record, however, reveals that both witnesses testified on direct that defendant was a loving, supportive husband and father, and Laura Fierro stated that defendant did his best to provide financial support to the family. Thus, the prosecutor's questions were appropriate for purposes of impeachment and rebuttal. (*People* v. *Siripongs, supra,* 45 Cal.3d at p. 578; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 790-793.)

■ Finally, defendant complains of the prosecutor's question to defendant's mother, Dolores Fierro, as to whether any of her other sons were "in situations where they don't have the freedom to meet with you on weekends." Defendant contends the question improperly implied that the witness's other sons were in prison. However, the record shows that counsel interposed an immediate objection which the trial court sustained. The question was never answered. The prosecutor never mentioned that the witness had other sons in prison or with criminal records. No follow-up questions were asked after the trial court sustained the objection. Thus, we perceive no reasonable possibility that the question, even if erroneous, was prejudicial. (*People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1194 [270 Cal.Rptr. 286, 791 P.2d 965].)

### 6. *Effect of Execution on Defendant's Family*

Defendant's first witness was his uncle, Rudy Garza. At the end of Garza's testimony on direct, the following colloquy occurred: "Q: How do you feel about the fact that [defendant] may have to spend the rest of his life in prison? [¶] A: I shudder at the thought. He has a wife and three lovely children. And that is very, very difficult, to say the least. [¶] Q: What—what kind of feelings do you have when—when you think about the possibility that he could be executed in the gas chamber? [¶] Mr. Purbaugh [Prosecutor]: I'm going to object as irrelevant. [¶] The Court: Sustained. [¶] Q: What would that do to the family? [¶] A: Devastate them."

 Defendant contends the trial court erroneously sustained the prosecutor's objection and thereby excluded otherwise admissible mitigating evidence concerning the emotional impact of a death sentence on defendant's family. The contention lacks merit. Although the objection was sustained, the record discloses that defense counsel immediately rephrased the question to ask, "What would that do to them," and the witness responded, "Devastate them." Thus, regardless of the merits of the objection and the trial court's ruling, the question was asked and answered. There is no basis for a finding of prejudicial error.

Furthermore, the record shows that four other members of defendant's family subsequently testified without objection as to the impact of defendant's execution on his family. Laura Fierro, defendant's wife, was asked: "What would happen to you and to the children if David were executed in the gas chamber?" She responded: "I wouldn't know what to do. It would break my heart." Defendant's aunt, Mrs. Cervantez, testified that a death sentence "would be a very hard thing" on his family. Defendant's sister, Theresa Sanchez, stated that defendant's situation was "breaking [the] heart" of his mother and stated that a death sentence "probably would kill us inside." Similarly, defendant's mother, Dolores Fierro, testified that the family would "all be broken hearted" if defendant were given the death penalty. Thus, assuming without deciding that defendant has a right to introduce evidence of the effect of a death sentence on his family (*People* v. *Cooper, supra,* 53 Cal.3d at p. 844, fn. 14; but see *Robison* v. *Maynard* (10th Cir. 1987) 829 F.2d 1501, 1505, cert. denied __ U.S. __ [116 L.Ed.2d 463, 112 S.Ct. 445]), that right was not violated.

### 7. *Alleged Prosecutorial Misconduct*

Defendant identifies three areas of misconduct in the prosecutor's argument at the penalty phase. He asserts that the prosecutor improperly: (1)

precluded the jury from considering lingering doubt of guilt as a factor in mitigation; (2) restricted sympathy as a factor in mitigation; and (3) equated lack of remorse with a failure to confess to the crime.

 We observe initially that defendant failed to object to any of the statements which he now characterizes as prejudicial misconduct. Accordingly, his claims are waived on appeal. (*People* v. *Bell, supra,* 49 Cal.3d at p. 535; *People* v. *Green, supra,* 27 Cal.3d at p. 34.) Nevertheless, we have reviewed the allegations of misconduct and find them to be groundless.

As defendant accurately observes, "[l]ingering doubt was a substantial theme presented in the case for mitigation." Counsel stated prior to the penalty phase that he intended to argue to the jury that his client was innocent and that "it would be a tragedy and unthinkable to put an innocent man to death." Several defense witnesses testified that defendant was not the killer and implied that someone else in defendant's family was. Defendant himself took the stand and stated: "My kids' life, I didn't kill nobody."

The prosecutor in argument stated that defendant's claim of innocence was "an incredibly brash, an incredibly cruel statement to make in light of the facts and the evidence, in light of what you folks know happened in this case, in light of the verdict you reached . . . ." He argued that the jury should be "offended" by that defense, and asserted: "if the defense wanted you to hear evidence that someone else did it, or that something else happened, or someone else was involved, the time and the place to do that is in the guilt phase when those people can come forward and sit here in front of you as the judges of facts and judges of truth . . . ." The prosecutor characterized the lingering doubt defense as a "cheap shot" and advised the jury: "You have no obligation to try this case again. You have received no new evidence, the decision you made in the guilt phase was a correct one. Based on all the law and all the facts, you made the right choice."

 Defendant asserts that the prosecutor's argument effectively "eliminated" lingering doubt as a viable consideration. The argument lacks merit. Defendant plainly had the right to argue his possible innocence to the jury as a factor in mitigation. (*People* v. *Farmer* (1989) 47 Cal.3d 888, 921, fn. 5 [254 Cal.Rptr. 508, 765 P.2d 940]; *People* v. *Thompson, supra,* 45 Cal.3d at pp. 134-135.) Indeed, defendant did precisely that, presenting testimony and lengthy argument to support his claim of innocence. The prosecutor, by the same token, had broad discretion to argue the merits of the case and comment on defendant's theory. (*People* v. *Bell, supra,* 49 Cal.3d at p. 538; *People* v. *Warren, supra,* 45 Cal.3d at p. 485, fn. 1.) Nothing in the prosecutor's remarks exceeded the bounds of proper argument.

■ Defendant also asserts the prosecutor improperly attempted to "withdraw" from the jury relevant considerations of sympathy for defendant's family. The prosecutor argued that the only relevant consideration was "sympathy for the defendant," "not sympathy for Mrs. Fierro, his mother, not sympathy for his children or his aunt, but sympathy for the defendant."

We are not persuaded that the prosecutor's argument effectively precluded consideration of sympathy for defendant's family. As noted earlier, defense counsel elicited considerable testimony concerning the impact the death penalty would have on defendant's family. Counsel also argued the issue directly and at length, noting that defendant's family was "just as innocent as the Allessies" and that contrary to the prosecutor's assertion, "you do have a right to consider the consequences that this will have on all the innocent victims." Defense counsel referred repeatedly to defendant's family, observing: "[H]e's still a human being. He's still the father of three lovely children. He still has a wife. [¶] He has a family that love him and he loves them. He has children who know him as their father. And I'm sure that he will always be their father." In concluding, counsel returned to the theme of family, stating: "And I think that his family does need him and his children do need him."

Thus, the jury heard considerable testimony and argument on the relevance and importance of sympathy for defendant's family. Assuming without deciding that such testimony and argument is relevant to the issue of mitigation (see *People v. Cooper, supra*, 53 Cal.3d at p. 844, fn. 14), it does not appear that the prosecutor's remarks led the jury to disregard the evidence in question. Moreover, we do not believe the court's instructions precluded the jury from considering defendant's family situation as a circumstance in mitigation. The trial court instructed the jury to consider the circumstances of the crime, as well as "any other circumstance which extenuates the gravity of the crime . . . and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." Although the instruction refers to sympathetic aspects of "defendant's" character rather than defendant's "family," the broad based charge to consider "any . . . aspect of defendant's character *or record*," in conjunction with the considerable testimony and argument focused on the family, sufficiently informed the jury that it could consider sympathy for defendant's family as a factor in mitigation. (Italics added.)

■ Lastly, relying on *People v. Coleman* (1969) 71 Cal.2d 1159 [80 Cal.Rptr. 920, 459 P.2d 248], defendant contends the prosecutor improperly characterized defendant's claim of innocence as evidence of lack of remorse.

In *Coleman*, we concluded that "any argument that failure to confess should be deemed evidence of lack of remorse is not permissible." (*Id.* at p. 1169.) Here, the prosecutor stated: "This man committed those crimes. You know it and I know it based on the facts and the law. And for him to stand up now and deny it is the abject opposite of sympathy. [¶] It is cold-blooded, it shows his attitude, it shows a total lack of remorse."

Under *Coleman, supra,* 71 Cal.2d. 1159, there appears to be little practical difference between a failure to confess and a claim of innocence; neither should be cited as evidence of lack of remorse. Nevertheless, we do not believe the error here was prejudicial. The remark concerning lack of remorse was brief and transitory. Morever, the prosecutor did not impermissibly characterize defendant's lack of remorse as an aggravating factor. (*People* v. *Walker* (1988) 47 Cal.3d 605, 649-650 [253 Cal.Rptr. 863, 765 P.2d 70].) Moreover, as we have noted on previous occasions, remorse "is universally deemed to be relevant at the penalty stage of a capital case, and it is likely the jury would have considered this factor in the course of exercising its broad sentencing discretion whether or not the prosecutor noted the point." (*People* v. *Carrera, supra,* 49 Cal.3d at p. 339.) As the jury was not otherwise misled about the pertinent evidence or its sentencing responsibilities, we see no reasonable possibility the prosecutor's brief remark could have affected the jury's decision. (*Ibid.*)

## 8. *Alleged Caldwell Error*

Defendant contends that the prosecutor made several remarks which improperly induced the jury to believe that the responsibility for imposing a sentence of death lay elsewhere. (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633].)

First, defendant notes that the prosecutor mentioned defendant's right to appeal the penalty verdict during the cross-examination of defendant's first witness, Rudy Garza.[24] In *Caldwell* v. *Mississippi, supra,* 472 U.S. 320, the prosecutor argued to the jury that theirs was not the final decision as to life or death, but that the case would be reviewed by an appellate court. The United States Supreme Court reversed the penalty, holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for

---

[24]The exchange on cross-examination occurred as follows: "Q: Now, you mentioned when you were asked about—the question about the death penalty—[¶] A: Yes. [¶] Q:—that you would like to have him have a chance for an appeal or possibly another trial? [¶] A: Yes. [¶] Q: Now, you're aware that he's going to get that opportunity no matter what the jury does, aren't you? [¶] A: Right. [¶] Q: He has that opportunity to appeal no matter what the jury decides the penalty? [¶] A: Yes, he has that option, yes."

determining the appropriateness of the defendant's death rests elsewhere." (*Id.* at pp. 328-329 [86 L.Ed.2d at p. 239].)

Defendant contends that the prosecutor's reference to defendant's right to appeal falls within the framework of *Caldwell.* The answer to defendant's claim may be found in *People* v. *Bittaker* (1989) 48 Cal.3d 1046 [259 Cal.Rptr. 630, 774 P.2d 659], where we stated: "Arguably the mere mention of appeal is improper, since it rarely serves any constructive purpose and may lead the jury on its own to infer that their responsibility for penalty determination is diluted. But when the context does not suggest appellate correction of an erroneous death verdict, the danger that a jury will feel a lesser sense of responsibility for its verdict is minimal." (*Id.* at p. 1106.) Plainly, the prosecutor's passing reference here to defendant's right to appeal was not intended to "dilute" the jury's sense of responsibility, and we do not believe that any reasonable juror would have construed it as such. There was no reversible error.

 Several additional statements by the prosecutor in closing argument present a somewhat closer question, however. The statements in question are set forth in full below (the specific remarks to which defendant objects are italicized):

"Starting off first, what exactly are the nature of your responsibilities in this case? How do you go about making a decision on which of two penalties that are available is the appropriate punishment for this defendant's crime?

"The defense counsel has already argued to you in his opening statement that this part of this case is substantially or totally different than the guilt phase that you have already participated in. In the guilt phase, he argues, you were to base your verdict on the law and the facts as you found them to be. That's true.

"In the penalty phase, he has argued you need not be bound by the law and the facts. He proposes instead that you may do whatever you like, that you must not be constrained by the law, that you should not—well, that you should do whatever feels good; that sympathy and mercy and the law should dictate or decide your verdict. This is false, very false.

"The defense will tell you, I'm sure, this same thing again in his argument after I conclude. And he will probably go on to tell you and attempt to convince you that since you have total freedom to do whatever you want, or whatever feels good, that thereby *when you return the verdict of death in this case, you have total, personal responsibility for that result. This, too, ladies and gentlemen, is false, blatantly false.*

"We, as a society, have a very great interest in seeing that our justice system is exactly that, just. We have a very great interest in seeing that this system does not proceed on the basis of whimsy . . . .

"When you render your verdict in this case, it must be based on the evidence that you've heard and the law and instructions that the Judge gives you; that, not whimsy, not caprice, not whatever feels good or feels right must the basis of your decision. That is our system. A verdict based on the facts and the law in this case will be a just and a correct verdict.

"Why would the defense attorney argue those things to you if they are not the law, if they are not correct? And I submit to you that it is a very significant reason why he argues that to you, because he wants to try to get you, as jurors, to take upon you a part of the guilt that belongs truthfully to his client. *He wants to make you feel personally responsible for the results of your deliberations, for the results in this phase of the trial.*

"*He wants to try to make you feel guilty for the verdict that you should render in this case based on the facts and the law. You must not allow this to happen, ladies and gentlemen.*

"You will not be doing your duty as jurors if you do allow that to happen. A verdict of death in this case will not be quote your fault unquote, as the defense would like to persuade you.

"It will be the result of this defendant's actions, his choice to be greedy, his choice to satisfy that greed by committing a robbery, his choice to take a gun along in the commission of that robbery, his choice to select Sam and Gertrude Allessie as his victims. [¶] . . . His display of absolute viciousness, of total depravity in stepping over a mortally wounded Sam Allessie, bending down over the man, pushing the end of the barrel of his pistol into Sam's chest, and shooting him again, executing him.

"It will be combination of these facts, ladies and gentlemen, of his conduct and his behavior and his crimes, and the law that the Judge gives you that will result in a death verdict in this case.

"*It will not be your responsibility, it will not be your fault.* The law determines[,] when the facts are applied with the law[,] what penalty is appropriate.

"You are here as representatives of our community to exercise and carry out the law. *It is not a personal—it is, of course, a personal decision, but I*

*think you see what I'm saying. It is not a personal responsibility, it is a personal decision to follow the law and arrive at the results that the law calls for.* That's the thing that you must do as jurors in this case."

Defendant contends that the italicized passages misled the jury to believe that they did not bear ultimate responsibility for the sentencing, but rather that the sentence was predetermined by "the law." Viewed in isolation, certain of the prosecutor's statements do appear to support the claim. However, we must assess the challenged remarks in the context of the penalty phase arguments as a whole. (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 713 [276 Cal.Rptr. 788, 802 P.2d 278].) So viewed, we perceive no danger that the prosecutor's remarks misled the jury. In admonishing the jurors not to "feel guilty" or "personally responsible," the prosecutor was merely suggesting, albeit inartfully, that the moral blame for the crimes and their consequences rests with defendant, not with the jurors; there was no suggestion that the law simply required the jurors to tally the competing factors in aggravation and mitigation, rather than to individually consider and assign moral weight to the evidence.

Indeed, later in his argument the prosecutor forcefully and repeatedly reminded the jurors of their individual sentencing responsibility and discretion. Reading from the court's instructions, he noted that the jurors were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors." Commenting further, he noted that the "law instructs you that you must be judges, that you must do some balancing and some weighing and some careful consideration of the merits on both sides of this case . . . . That's very clear from the law, ladies and gentlemen, that that must be the basis of your verdict." Finally, the prosecutor emphasized the moral component of the jury's decision, arguing that "the death penalty verdict in this case is morally right."

Defense counsel also stressed the jurors' individual responsibility to weigh the evidence: "Each one of you has a sworn duty to make your own decision," he stated. "[E]ach one of you has to . . . take that individual responsibility," he continued, and "you are going to have to live with [the decision] the rest of your life." Defense counsel also disputed the prosecutor's characterization of his opening argument, stating: "Now, I'm not suggesting to you that if you decide to vote for death it would be your fault. [¶] I am talking about responsibility. I am talking about reaching a decision that you are going to be able to live with the rest of your life."

In light of the foregoing, the prosecutor's remarks could not have misled the jurors to believe that the responsibility for determining the appropriate

penalty rested on someone or something besides themselves. (*People* v. *Kaurish, supra,* 52 Cal.3d at pp. 712-715; *People* v. *Lang* (1989) 49 Cal.3d 991, 1035 [264 Cal.Rptr. 386, 782 P.2d 627].) Nor do we perceive any danger that the jury misapprehended the weighing process. As noted, both court and counsel stressed that the sentencing process was not to be performed in a mechanical fashion, but rather involved a moral judgment to be made by each juror individually. (*People* v. *Crandell, supra,* 46 Cal.3d at pp. 882-883.) Although defendant cites several comments by the prosecutor referring to an imaginary "line" which, if crossed, would indicate a sentence of death,[25] it is clear that the prosecutor was referring to a "line" in the jury's overall evaluation of the evidence, not an arithmetic tally of the aggravating and mitigating factors.

▆▆▆ Finally, defendant contends the prosecutor improperly portrayed the weighing process as essentially an inquiry into the moral justification for the crimes, and failed to acknowledge the existence of mitigating factors, suggesting that there were none. (See *People* v. *Crandell, supra,* 46 Cal.3d at p. 884.) We disagree. The prosecutor characterized the circumstances of the crime as "extremely important," the "crux of the whole matter before you." He described the slaying as "senseless," "brutal" and "heinous." We find no evidence, however, that he hinged the death penalty decision on whether the capital offenses were morally justified, an irrelevant consideration absent evidence of moral justification by the defendant. (*Ibid.*) Nor did the prosecutor "fail to acknowledge the existence of mitigating circumstances . . . ." (*Ibid.*) Although at one point he stated, "in all sincerity there is no mitigation in this case," it was after an extensive survey and rebuttal of the mitigating evidence offered by defendant. This was entirely appropriate. (*People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 789-790; *People* v. *Crandell, supra,* 46 Cal.3d at p. 884.)

### 9. *Death Penalty as Deterrent/Future Dangerousness*

▆▆▆ The prosecutor argued that the death penalty was morally appropriate because "we, as a community, as a larger society and group of people, have [the] . . . right to defend ourselves against this man . . . . We have the right to live secure against people like David Fierro. On a moral basis, I'm not talking law, I'm talking morality, on a moral basis we have a right to

---

[25]The prosecutor's remarks in this regard were as follows: "That line is established by the factors in aggravation and the factors in mitigation and how you weigh those. [¶] That line is the border between your choice of life without possibility of parole and the death penalty. [¶] The law says, ladies and gentlemen, that when you cross that line,—when I say you cross the line, I mean in your evaluation of the defendant's conduct. When you realize that the defendant in his crime had crossed that line, the law says death penalty is the appropriate punishment."

live secure from a man like this." Defendant asserts that the prosecutor's argument improperly urged the jury to impose the death penalty because it was a more effective deterrent than life imprisonment. (See *People* v. *Bittaker, supra,* 48 Cal.3d at p. 1105.) We perceive no such implication in the prosecutor's remarks, however, and believe that no reasonable juror would have construed them as such.

The prosecutor went on to observe that imprisonment would not protect other inmates from defendant. He described defendant as "a violent man" and observed: "The best predictor of future conduct is past conduct. And especially that is true in this case. You look at the things that David Fierro has done that you have before you and you ask yourselves: will this man be violent again? And the answer to that clearly in my mind is yes. We see a pattern of escalating violence."

These remarks were not improper. "[W]e have held that argument directed to a defendant's future dangerousness, when based on evidence of the defendant's past conduct rather than expert opinion, is proper and does not invite speculation as to the defendant's possible release. [Citations.]" (*People* v. *Hayes* (1990) 52 Cal.3d 577, 635-636 [276 Cal.Rptr. 874, 802 P.2d 376].) Moreover, "we have consistently held that it is not misconduct for a prosecutor to argue at the penalty phase that if a defendant were sentenced to prison he might kill another prisoner. [Citations and fn. omitted.]" (*People* v. *Taylor, supra,* 52 Cal.3d at p. 750.)

### 10. *Alleged Instructional Errors*

Defendant contends the trial court committed instructional error in three instances.

First defendant claims the court erred in refusing to give a proposed instruction which provided: "You are instructed that if your decision in the penalty phase of this trial, is that the defendant should be put to death, the sentence will be carried out. On the other hand, if you determine that life without the possibility of parole is the proper sentence, you are instructed that the defendant will never be released from prison." In response to the court's observation that the instruction was untrue, defense counsel proposed to modify the instruction to provide that the jurors must "assume that the sentence that they impose will be carried out." The prosecutor opposed both the original and the modified instruction, noting that the jury had not manifested any concern about the issue. The trial court refused to give the instruction in either form.

The trial court properly refused the proffered instruction. In *People* v. *Thompson, supra,* 45 Cal.3d 86, we affirmed a trial court's decision to reject

an instruction virtually identical to that presented here. As we there observed, the proposed instruction contains the twin vices of misstating the facts and inviting "the same sort of speculation as to whether unidentified officials will in the future perform their job" which we cautioned against in *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430]. (*People* v. *Thompson, supra,* 45 Cal.3d at p. 130; accord *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1245, fn. 13 [255 Cal.Rptr. 569, 767 P.2d 1047].) The jury here received no information and raised no question as to whether the sentence would in fact be carried out.[26] Accordingly, the requested instruction was properly refused.

Defendant's alternative request to instruct the jury that they should assume the sentence they imposed would be carried out, was not similarly misleading, and, as we have previously observed, should have been given. (*People* v. *Thompson, supra,* 45 Cal.3d 86, 131.) Nevertheless, absent any evidence to suggest that the jury was confused about the issue or concerned that their sentence would not be carried out, the failure to so instruct cannot be deemed prejudicial.

 Defendant next asserts that the trial court should have instructed the jury, sua sponte, not to double count the instant crimes under section 190.3, factors (a) (circumstances of the crime) and (c) (prior felony conviction). Defendant cites nothing from the record to suggest that the jury was somehow led to believe that the guilty verdict they had rendered in this case qualified as a prior felony conviction under factor (c). Moreover, the jury was specifically instructed that they were not to consider any evidence of any other crime, other than defendant's prior burglary conviction, as an aggravating circumstance. Hence, we perceive no reasonable possibility that the jury was misled into double counting the instant offense under factors (a) and (c) or, for that matter, factors (a) and (b) (prior violent conduct). (*People* v. *Melton, supra,* 44 Cal.3d at p. 763.)

 Defendant also asserts that the giving of CALJIC No. 8.84.1 erroneously led the jury to double count his prior burglary conviction under factors (b) (prior violent conduct) and (c) (prior felony conviction). Although both the prosecutor and the trial court here informed the jury that they should *not* consider defendant's prior felony under both factors, "the jury was entitled to consider the relevance of defendant's prior felony conviction

---

[26]Defendant suggests that the instruction was necessary because the prosecutor referred to defendant's right to appeal during the cross-examination of defendant's uncle, Rudy Garza. As noted earlier (*ante,* at pp. 244-245, this isolated reference to defendant's right to appeal in no way suggested that the sentencing responsibility rested elsewhere, and contained no implication that the sentence imposed would not be carried out.

for both purposes under factors (b) *and* (c)." (*People* v. *Whitt, supra,* 51 Cal.3d at p. 654, fn. 26, original italics; accord *People* v. *Melton, supra,* 44 Cal.3d at pp. 764-765.)

Finally, defendant claims that the court's instructions on his prior assault with a deadly weapon and the lesser crime of battery were flawed because they failed to distinguish between the culpability of defendant and his partner. Defendant also contends there was insufficient evidence to warrant the instruction on assault.

 To demonstrate defendant's prior violent conduct, the prosecutor presented evidence that defendant and a companion entered the home of Tim Deno and assaulted him during the course of a burglary. Deno testified that he was struck at least twice from behind by defendant's companion. As Deno was falling, defendant struck him in the forehead with a telephone receiver. As a result of the assault, Deno suffered a concussion, a skull fracture and three cuts requiring twenty stitches.

Defendant contends the evidence did not support an instruction on assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245, subd. (a).) ██ ██ On the contrary, the evidence demonstrated beyond a reasonable doubt that defendant committed assault with a deadly weapon; an object such as a telephone may constitute a deadly weapon if used in such a manner as to be capable of producing death or great bodily injury, and the jury was so instructed. (*In re Jose R.* (1982) 137 Cal.App.3d 269 [186 Cal.Rptr. 898].)[27] Furthermore, although it is not necessary that the force used actually produce injury (*People* v. *Wingo, supra,* 14 Cal.3d at p. 176), here the victim was struck on the forehead without warning and with great force, thus plainly suffering great bodily injury. (*In re Nirran W.* (1989) 207 Cal.App.3d 1157, 1161-1162 [255 Cal.Rptr. 327].)

 Defendant further asserts that the instructions were flawed because they failed to distinguish between the acts of assault committed by himself and his compatriot. In light of the trial court's instruction to the jury that they must be satisfied beyond a reasonable doubt that the defendant did, in fact, commit the acts of assault on Deno, we discern no possibility the jury

---

[27]Defendant further suggests that the evidence did not support a finding that defendant struck Deno with the telephone receiver. On the contrary, Deno's testimony that defendant was holding a telephone receiver and struck out with whatever was in his hand, would support such a finding. In any event, it is well settled that the use of hands or fists alone may support a conviction of assault by means of force likely to produce great bodily injury. (*People* v. *Wingo* (1975) 14 Cal.3d 169, 176 [121 Cal.Rptr. 97, 534 P.2d 1001].) The nature and force of the blow to Deno's head were sufficient to satisfy the statute.

attributed the acts of defendant's companion to himself. Defendant also claims the prosecutor improperly "blurred" the actions of defendant and his partner. On the contrary, the prosecutor in opening argument accurately stated that Deno was struck from behind by the second man and as he fell "he saw Mr. Fierro strike him in the forehead with some object which he believed was the receiver of the phone." The prosecutor's description of the events in closing argument was equally accurate.[28] Accordingly, we conclude there was no instructional error.

### 11. *The Modification Motion*

 Defendant contends the judgment of death must be reversed or the matter remanded for a new hearing on the application for modification of verdict (§ 190.4, subd. (e)) for two reasons: (1) the trial court double counted a burglary conviction as two aggravating circumstances under factors (b) and (c); and (2) the trial court improperly read and considered matters in a probation report.

Defendant's first contention is plainly without merit. Under section 190.4, subdivision (e), the court is directed to independently review and reweigh the evidence of aggravating and mitigating circumstances, and to determine whether the weight of the evidence supports the jury verdict. (*People v. Clark* (1990) 50 Cal.3d 583, 634 [268 Cal.Rptr. 399, 789 P.2d 127].) The only evidence the court is to review is that which was before the jury. (*Id.* at pp. 634-635.) Since the jury was clearly entitled to evaluate the prior burglary for its relevance under both factors (b) and (c) (*People v. Whitt, supra,* 51 Cal.3d at p. 654, fn. 26; *People v. Melton, supra,* 44 Cal.3d at p. 764), the court was similarly authorized.

For the same reason, however, the court should not have considered the probation report. "Under section 190.4, subdivision (e), the court is directed to review the evidence presented to the jury; a probation report is not presented to the jury." (*People v. Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].) Nevertheless, on the record presented the error must be deemed nonprejudicial. In denying the application, the court considered each of the statutory factors in light of the evidence presented at the penalty phase hearing, and concluded: "I am persuaded by my own

---

[28]Defendant takes issue with the prosecutor's statement: "And then as Mr. Fierro used the phone purportedly to call regarding his broken car, Mr. Fierro's partner smashes Tim Deno in the back of the head and Mr. Fierro smashes Tim Deno in the face, in the forehead, knocking him unconscious." Defendant argues the prosecutor inaccurately attributed the "knock-out" blow solely to defendant. The statement, however, could reasonably be read to attribute unconsciousness to both blows. In any event, the jury heard the evidence and was capable of distinguishing the actions of defendant and the second man.

independent review and determination, based on all the facts and evidence in this case, that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that the proper verdict is death."

The trial court made no reference to any of the potentially prejudicial matters contained in the probation report.[29] Indeed, it is apparent from the record that they played no role whatsoever in the court's decision. In articulating its reasons for denying the application, the court relied exclusively on the circumstances of the crime, which it described as "wanton and brutal," the presence of prior violent criminal activity, which the court characterized as "particularly reprehensible," and the presence of a prior felony conviction. "[A]bsent evidence in the record to the contrary, we must assume that the court was not improperly influenced by the report in ruling on the application." (*People v. Adcox* (1988) 47 Cal.3d 207, 274 [253 Cal.Rptr. 55, 763 P.2d 906]; accord *People v. Douglas* (1990) 50 Cal.3d 468, 540 [268 Cal.Rptr. 126, 788 P.2d 640].) Under the circumstances, we perceive no reasonable possibility the court's reading of the probation report affected its ruling. (*People v. Ramirez, supra*, 50 Cal.3d at p. 1202.)

### 12. *Disproportionate Penalty*

■ Defendant contends that he should be given proportionality review on both an intracase and intercase basis. ■ We have held in numerous cases that intercase proportionality review is not required. (See, e.g., *People v. Hayes, supra*, 52 Cal.3d at p. 645; *People v. Lewis, supra*, 50 Cal.3d at p. 285; *People v. Howard* (1988) 44 Cal.3d 375, 444-446 [243 Cal.Rptr. 842, 749 P.2d 279].)

■ As to intracase review, defendant relies on *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] to assert that the death penalty is disproportionate to his individual culpability. His reliance is misplaced. In *Dillon*, an immature 17-year-old who shot and killed his victim out of fear and panic was sentenced to life in prison, despite the view of the judge and jury that the sentence was excessive in relation to his moral culpability. (34 Cal.3d at p. 487.) Here, defendant, after shooting his victim once in the heart, straddled his body and fired a second shot point-blank into his chest. The cold-blooded execution of the victim in this case sharply distinguishes it from *Dillon*. We do not find the death penalty disproportionate to defendant's culpability.

---

[29]The probation report contained information, not presented at the penalty hearing, about defendant's use of drugs and alcohol, his admission that he participated in the offense and habitually carried a gun, his conviction for being under the influence of heroin while in jail pending trial in this case, numerous disciplinary citations while in custody, and defendant's "rap sheet" showing several convictions for disturbing the peace and vandalism.

Defendant also contends the court erred in denying his request to give a modified version of CALJIC No. 8.21, which would have allowed the jury to make a nonbinding recommendation to the court to reduce the first degree murder conviction to second degree murder.[30] He claims the court erred in refusing to permit the jury "to express its opinion on the appropriateness of the felony-murder doctrine." The trial court properly refused the proposed instruction. The jury's duty is to apply the law to the facts, not to give recommendations to the court as to whether or not the conviction should be reduced to second degree murder.

Finally, defendant contends the trial court erroneously failed to exercise its discretion in denying defendant's motion to strike the special circumstance finding pursuant to section 1385. Section 1385, subdivision (a), provides generally that the court may order an action to be dismissed "in furtherance of justice."

Defendant made three attempts to set aside the special circumstance finding and penalty verdict. First, he moved for a new trial on the ground that the evidence was insufficient to support the special circumstance finding. The trial court denied the motion, finding that the "evidence as a whole is sufficient to support and sustain the verdicts of the jury in their entirety in this case . . . ." Defendant next moved under section 1385 to strike the special circumstance finding in the interest of justice, arguing that the sentence was disproportionate to his personal culpability. The prosecutor opposed the motion, noting defendant's history of violence and the brutality of the instant offenses. The trial court summarily denied the motion. Finally, defendant made his application to modify the verdict pursuant to section 190.4, subdivision (e). As noted, the trial court determined that the evidence and law substantially supported the jury's sentence.

Defendant now claims that the trial court did not "understand its responsibility" under section 1385, and speculates that the court equated the section 1385 motion with the new trial motion, which it denied on the ground that the evidence was sufficient to support the special circumstance finding.

We have not previously determined whether a court has the power to dismiss a special circumstance after the jury has returned a verdict of death.

---

[30]At the time, CALJIC No. 8.21 (4th ed. 1979) provided as follows (defendant's proposed modification is set forth in italics): "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as result of the commission of or attempt to commit the crime of [robbery], and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree, under the provisions of section 189 of the Penal Code. [¶] *However, the jury may recommend that such a killing be murder of the second degree, based on all the facts and circumstances of the case. The Court would consider such a recommendation if it is made.* The specific intent to commit [robbery] and the commission or attempt to commit such crime must be proved beyond a reasonable doubt."

(See *People* v. *Cooper, supra,* 53 Cal.3d at p. 849.) We need not resolve the issue here, for the trial court entertained extensive argument on the merits of the motion before ruling. Thus, assuming arguendo that the trial court had that power, its decision was a proper exercise of discretion. (*People* v. *Carrera, supra,* 49 Cal.3d at p. 333.)

### 13. *Constitutionality of the 1978 Death Penalty Law*

Defendant raises multiple challenges to the constitutionality of the 1978 death penalty law. We have previously rejected each of his claims. (*People* v. *Morris, supra,* 53 Cal.3d at p. 234; *People* v. *Medina* (1990) 51 Cal.3d 870, 911 [274 Cal.Rptr. 849, 799 P.2d 1282]; *People* v. *Douglas, supra,* 50 Cal.3d at p. 541; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1068 [251 Cal.Rptr. 757, 761 P.2d 680]; *People* v. *Howard, supra,* 44 Cal.3d at pp. 443-444; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779.) The United States Supreme Court has also upheld the 1978 law. (*Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]; *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].) We therefore reject defendant's challenges.

### CONCLUSION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment as to guilt and death eligibility. After review, I have found no error warranting reversal or vacation on either issue.

I dissent, however, as to penalty.

In *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], the United States Supreme Court reviewed a judgment of death. At the penalty phase of the trial below, defense counsel "plea[ded]" in their summations that "the jury confront both the gravity and the responsibility of calling for another's death, even in the context of a capital sentencing proceeding." (*Id.* at p. 324 [86 L.Ed.2d at p. 236].) By contrast, in his summation the prosecutor "sought to minimize the jury's sense of importance of its role." (*Id.* at p. 325 [86 L.Ed.2d at p. 237].) Specifically, he told the jurors that "[defense counsel] would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. . . . Your job is reviewable." (*Ibid.,* internal quotation marks omitted.) He also said that "the decision you render is automatically reviewable by the Supreme Court. Automatically . . . ." (*Id.* at pp. 325-326 [86 L.Ed.2d at p. 237], internal quotation marks omitted.)

The *Caldwell* court concluded that the prosecutor's comments were improper under the Eighth Amendment to the United States Constitution: they "sought to minimize the jury's sense of responsibility for determining the appropriateness of death." (472 U.S. at p. 341 [86 L.Ed.2d at p. 247].) It proceeded to vacate the sentence of death and reverse the judgment as to penalty: "Because we cannot say that [the prosecutor's remarks] had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires." (*Ibid.*)

In this case too—which was tried a year after *Caldwell* —the verdict of death should be set aside and the penalty judgment should be reversed.

Here, as in *Caldwell*, defense counsel urged the jury to confront its grave responsibility for determining the appropriateness of death.

For example, at one point counsel told the jurors that "each one of you has to make your own decision and take that individual responsibility that you are going to have to live with the rest of your life."

At another: "Yes, I'm telling you that it's your individual responsibility. I'm telling you that it's a responsibility that each of you have to carry on your shoulders. And it's one that you'll have to live with the rest of your life."

Here, as in *Caldwell*, the prosecutor sought to minimize the jury's sense of its responsibility—and did so more often and more pointedly than his counterpart in that case.

Thus, at one point the prosecutor told the jurors that it "is false, blatantly false," that "when you return the verdict of death in this case, you have total, personal responsibility for that result."

At another, he said that "[defense counsel] wants to make you feel personally responsible for the results of your deliberations, for the results in this phase of the trial." He urged, "You must not allow this to happen . . . ."

At yet another: "It will be a combination of [the] facts, ladies and gentlemen, of [defendant's] conduct and his behavior and his crimes, and the law that the Judge gives you that will result in a death verdict in this case.

"It will not be your responsibility, it will not be your fault. The law determines when the facts are applied with the law what penalty is appropriate.

"You are here as representatives of our community to exercise and carry out the law. It is not a personal—it is, of course, a personal decision, but I

think you see what I'm saying. It is not a personal responsibility, it is a personal decision to follow the law and arrive at the results that the law calls for. That's the thing that you must do as jurors in this case."

The prosecutor's comments, quoted above, were improper under the Eighth Amendment. On their face, they "sought to minimize the jury's sense of responsibility for determining the appropriateness of death." (*Caldwell* v. *Mississippi, supra,* 472 U.S. at p. 341 [86 L.Ed.2d at p. 247].) In essence, the prosecutor declared that "the responsibility . . . rested not on [the jurors] but on a reification he called 'the law[.]' " (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 661 [244 Cal.Rptr. 181, 749 P.2d 836] (conc. & dis. opn. of Mosk, J.).) Surely, the remarks could have been so understood by a reasonable juror. It must be acknowledged that the prosecutor might perhaps have intended his comments to serve other, permissible purposes as well. But it would blink the facts to assert that he did not aim them at the target that he so squarely hit.

Having reviewed the record, I cannot say that the prosecutor's constitutionally improper comments were without effect. In the case at bar, death was not a foregone conclusion. The mitigating evidence was significant. True, the aggravating evidence was not insubstantial. Certainly, the crime itself was tragic. But by today's standards, it was—regrettably—routine. In view of the foregoing, I cannot conclude that the jury's penalty determination is constitutionally reliable.[1]

For the reasons stated above, I would vacate the verdict of death and reverse the judgment as to penalty.

**KENNARD, J.,** Concurring and Dissenting.—The Eighth Amendment to the federal Constitution does not bar consideration of a victim's personal characteristics to determine penalty in a capital case, but evidence and argument on this subject must be authorized by statute. Penal Code section 190.3 (hereafter section 190.3), a part of our voter-enacted death penalty law, lists those matters that the trier of penalty "shall consider" in deciding whether to return a verdict of death. In *People* v. *Edwards* (1991) 54 Cal.3d 787 [1 Cal.Rptr.2d 696, 819 P.2d 436], this court purported to hold that the section 190.3 factor for "circumstances of the crime" generally encompasses the victim's personal characteristics and the emotional impact of the capital

---

[1] In passing, I note my firm agreement with the conclusion Justice Kennard arrives at in her separate opinion herein: for purposes of Penal Code section 190.3, the circumstances of the crime must be construed narrowly—and certainly cannot be given the practically limitless scope that the majority purport to discern. My views on the matter, which I expressed in my concurring and dissenting opinion in *People* v. *Edwards* (1991) 54 Cal.3d 787, 850-856 [1 Cal.Rptr.2d 696, 819 P.2d 436], are substantially similar to those which she states in her separate opinion.

crimes on the victim's family. Because the facts of the case did not present the issue, I did not join that part of the majority opinion. (*Id.* at pp. 849-850 (conc. opn. of Kennard, J.).)

This case does present an issue regarding the propriety of a prosecutor's comments during penalty phase argument about a murder victim's personal characteristics that were unknown to the defendant. Although the comments were an insignificant part of the prosecutor's overall argument, the propriety of the comments should be addressed and determined.

The majority concludes that the prosecutor committed no misconduct during argument to the jury at the penalty phase by referring to details of murder victim Sam Allessi's personal life and to the physical and emotional suffering of robbery victim Trudy Allessi. As I shall explain, the prosecutor remained within statutory bounds when he referred to Trudy Allessi's suffering and to facts about Sam Allessi that were revealed during proof of the events constituting defendant's heinous crimes, but the prosecutor exceeded those statutory bounds when he referred to facts about Sam Allessi that defendant could not have known and that were not properly adduced in proof of guilt. The impropriety does not require reversal of the judgment of death, however, because there is no reasonable possibility that the prosecutor's brief and mild comments influenced the penalty verdict. Thus, I concur in the affirmance of the judgment imposing the penalty of death.

I

The Eighth Amendment to the United States Constitution, which prohibits the infliction of cruel and unusual punishment, imposes limits on the scope of evidence and jury argument in death penalty cases. The Eighth Amendment does not, however, bar evidence of or argument on the personal characteristics of the victim of the capital crime, whether or not those characteristics were known to the defendant at the time of the crime. Nor does it bar evidence or argument concerning the emotional impact of the crimes on members of the victim's family. The United States Supreme Court has held that these matters demonstrate "the specific harm" caused by the defendant's capital crimes, and that this in turn is a legitimate sentencing consideration under the Eighth Amendment. (*Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed. 720, 736, 111 S.Ct. 2597, 2609] (hereafter *Payne*).)

California's death penalty law, however, limits the scope of evidence and jury argument in a manner independent of the limits imposed by the Eighth Amendment to the federal Constitution. Under our state law, the prosecutor's case in aggravation is confined to the factors listed in Penal Code section 190.3. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 775 [215 Cal.Rptr. 1, 700 P.2d

782].) This provision does not expressly list the specific harm caused by the crime, the victim's personal characteristics, or the emotional impact of the capital crimes on the victim's family. Under our state law, therefore, the jury may consider these matters in making its penalty determination only if they fall within the ambit of one of the listed factors.

The issue presented is one of statutory construction: Does the term "circumstances of the crime" as used in factor (a) of section 190.3 include personal characteristics of the victim that were not known or reasonably apparent to the defendant at the time of the capital offense and that were not properly adduced in proof of guilt? In construing a statute, a court's objective is to ascertain and effectuate legislative intent. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154].) To determine that intent, a court begins with the words of the statute (*Reiter* v. *Sonotone Corp.* (1979) 442 U.S. 330, 337 [60 L.Ed.2d 931, 936, 99 S.Ct. 2326]), giving them their "usual, ordinary, and common sense meaning" (*In re Rojas* (1979) 23 Cal.3d 152, 155 [151 Cal.Rptr. 649, 588 P.2d 789]; see also *Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 208-209 [271 Cal.Rptr. 191, 793 P.2d 524]; *City of Santa Cruz* v. *Municipal Court* (1989) 49 Cal.3d 74, 90 [260 Cal.Rptr. 520, 776 P.2d 222]).

The first step, therefore, is to decide whether the usual and ordinary meaning of "circumstances of the crime" includes within it the personal characteristics of the victim. In performing this task, it is helpful to review certain decisions of the United States Supreme Court. Although the high court's understanding of the phrase "circumstances of the crime" does not provide an authoritative construction of our state statute, it is persuasive on what the words are commonly understood to mean in the context of a capital sentencing scheme.

In *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], the defendant was sentenced to death for murdering an elderly couple. At the penalty phase the prosecution had introduced a "victim impact statement" that included evidence of the victims' personal characteristics and the emotional impact of the crimes on the victims' family. The United States Supreme Court granted review to determine whether the Eighth Amendment to the federal Constitution prohibited a capital sentencing jury from considering such evidence. The court began its analysis by noting that the penalty decision in a capital case required an individualized determination "based on 'the character of the individual and *the circumstances of the crime.*'" (*Id.* at p. 502 [96 L.Ed.2d at p. 448], italics added.) The state argued that "the emotional trauma suffered by the family and the personal characteristics of the victims . . . should be considered a 'circumstance' of the crime . . . ." (*Id.* at p. 503 [96 L.Ed.2d at p. 448].) The high court rejected this argument,

holding that in a particular case this evidence might be "wholly unrelated to the blameworthiness of a particular defendant" and "could divert the jury's attention away from the defendant's background and record, and *the circumstances of the crime.*" (*Id.* at pp. 504-505 [96 L.Ed.2d at pp. 449-450], italics added.) In a footnote, the court stated: "Our disapproval of victim impact statements at the sentencing phase of a capital case does not mean, however, that this type of information will never be relevant in any context. Similar types of information may well be admissible because they relate directly to the circumstances of the crime." (*Id.* at p. 507, fn. 10 [96 L.Ed.2d at p. 451].)

Thus, a majority of the United States Supreme Court considered it self-evident that the words "circumstances of the crime" generally did not include evidence relating to the personal characteristics of a murder victim and the emotional impact of the crimes on the victim's family, although such evidence might be so included in a particular case.

In *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207], the defendant killed the victim in a public park and scattered his belongings on the ground. During argument at the penalty phase, the prosecutor read a religious tract that had been found near the victim's body, using the tract to illustrate the victim's personal characteristics. The high court noted that its decision in *Booth* v. *Maryland, supra,* 482 U.S. 496, had left open the possibility that "the kind of information contained in victim impact statements could be admissible if it 'relate[d] directly to the circumstances of the crime.'" (*South Carolina* v. *Gathers, supra,* 490 U.S. at p. 811 [104 L.Ed.2d at p. 883].) But the court concluded that the contents of the tract "cannot be said to relate directly to the circumstances of the crime" because there was no evidence the defendant had read it and it was "extremely unlikely" he had done so. (*Id.* at pp. 811-812 [104 L.Ed.2d at p. 883].) A majority of the high court thus held again that the term "circumstances of the crime" did not include personal characteristics of the victim that were unknown to the defendant at the time of the crime.

The United States Supreme Court overruled these two decisions in *Payne, supra,* 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597]. But the court did not retract its earlier conclusions about what did and did not constitute "circumstances of the crime." Instead, the court rejected the more fundamental premises of its earlier decisions about what the Eighth Amendment permitted as penalty considerations in a capital case. The court concluded that the "harm caused by the crime" was a constitutionally valid sentencing consideration even when the harm resulted from circumstances unknown to the defendant at the time of the crime. The court concluded that victim impact evidence was "simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question," and

therefore the Eighth Amendment did not bar its use. (*Id.* at p. __ [115 L.Ed.2d at pp. 735-736, 111 S.Ct. at pp. 2608-2609].)

In the course of its analysis, the high court said that the prosecution had a legitimate interest in presenting evidence about the victim's personal characteristics to counteract similar evidence about the defendant. To illustrate the potential unfairness that would result if evidence about the victim were barred, the court noted that the defendant in the case it was reviewing had presented evidence about himself: "The capital sentencing jury heard testimony from Payne's girlfriend that they met at church, that he was affectionate, caring, kind to her children, that he was not an abuser of drugs or alcohol, and that it was inconsistent with his character to have committed the murders. Payne's parents testified that he was a good son, and a clinical psychologist testified that Payne was an extremely polite prisoner and suffered from a low IQ." (*Payne, supra,* 501 U.S. __, __ [115 L.Ed.2d 720, 735-736, 111 S.Ct. 2597, 2608-2609].) The court observed: "None of this testimony was related to the circumstances of Payne's brutal crimes." (*Id.* at p. __ [115 L.Ed.2d 736, 111 S.Ct. at p. 2609].)

Nothing in *Payne, supra,* 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597], suggests that the plain meaning of "circumstances of the crime," as used in a capital sentencing scheme, generally encompasses evidence of either the victim's personal characteristics or the emotional impact of the crimes on the victim's family. To the contrary, the United States Supreme Court studiously avoided taking issue with this aspect of the decisions it overruled, and its statement that *the defendant's* personal characteristics were *not* related to the circumstances of the crime clearly implies that the victim's personal characteristics were also unrelated. Rather than including victim impact as a "circumstance of the crime," the high court in *Payne* expanded from two to three the number of considerations permissible for capital sentencing under the Eighth Amendment. Previously a death sentence might be based only on the defendant's character and background and the circumstances of the crime, but after *Payne* it might be based also on the specific harm caused by the crime.

In *People v. Edwards, supra,* 54 Cal.3d 787, the majority did not consider this compelling evidence that the phrase "circumstances of the crime" as used in a capital sentencing scheme does not encompass personal characteristics of the victim that were unknown to the defendant. Instead, the majority relied primarily on a dictionary definition of the word "circumstance" as meaning " '[t]hat which surrounds materially, morally, or logically.' " (*Id.* at p. 833, quoting 3 Oxford English Dict. (2d ed. 1989) p. 240, "circumstance," first definition.) The majority concluded that the specific harm caused by the crime surrounds it "materially, morally, or logically," and therefore is a

"circumstance of the crime" within the meaning of that phrase in section 190.3.

Other accepted definitions are somewhat narrower than the one on which the majority relied. For example, a legal dictionary defines "circumstances" as "[a]ttendant or accompanying facts, events, or conditions." (Black's Law Dict. (6th ed. 1990) p. 243.) A federal court has defined "circumstances" as " 'facts or things standing around or about some central fact.' " (*State of Maryland* v. *United States* (4th Cir. 1947) 165 F.2d 869, 871 [1 A.L.R.2d 213].) And a state court has defined "circumstances of the offense" as " 'the minor or attendant facts or conditions which have legitimate bearing on the major fact charged.' " (*Commonwealth* v. *Carr* (Ct.App. 1950) 312 Ky. 393, 395 [227 S.W.2d 904, 905].)

But courts must construe statutory language in context, not in isolation; they must harmonize related provisions and avoid any interpretation that makes some words unnecessary or redundant. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) When a statute contains a list or catalog of items, a court determines the meaning of each by reference to the others, giving preference to an interpretation that makes the items similar in nature and scope.[1] (See *People* v. *Rogers* (1971) 5 Cal.3d 129, 142 [95 Cal.Rptr. 601, 486 P.2d 129]; *Armenta* v. *Churchill* (1954) 42 Cal.2d 448, 454 [267 P.2d 303]; *People* v. *Thomas* (1945) 25 Cal.2d 880, 899-900 [156 P.2d 7]; *Treasure I. C. Co.* v. *St. Bd. of Equal.* (1941) 19 Cal.2d 181, 188 [120 P.2d 1].) Thus, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant or would otherwise make the item markedly dissimilar to the other items in the list. (See *Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159-1160 [278 Cal.Rptr. 614, 805 P.2d 873]; *Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 50 [276 Cal.Rptr. 114, 801 P.2d 357]; *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at pp. 1390-1391.)

Section 190.3 contains a statutory list of factors relevant to the penalty decision in a capital case. Under the principle of construction mentioned

---

[1]The principle of construction that items grouped in a list should be given related meaning is known to legal scholars under the Latin names *ejusdem generis* and *noscitur a sociis*. (See generally, 2A Sutherland, Statutory Construction (Sands 4th ed. 1984 rev.) §§ 47.16-47.22, pp. 161-193.) As the United States Supreme Court has remarked, however, " 'One hardly need rely on such Latin phrases . . . to reach this obvious conclusion.' " (*Third National Bank* v. *Impac Limited, Inc.* (1977) 432 U.S. 312, 322, fn. 16 [53 L.Ed.2d 368, 376, 97 S.Ct. 2307], quoting *United States* v. *Feola* (1975) 420 U.S. 671, 708 [43 L.Ed.2d 541, 566, 95 S.Ct. 1255] (dis. opn. of Stewart, J.).)

above, each factor should "take color" from the others (*Armenta* v. *Churchill, supra*, 42 Cal.2d 448, 454), and the scope of each should be "enlarged or restricted to accord with those terms" (*People* v. *Rogers, supra*, 5 Cal.3d 129, 142). Thus, the factor for the "circumstances of the crime" should be given a narrow meaning if a broader meaning would make other items superfluous.

The majority's construction of "circumstances of the crime" makes this factor so broad that it encompasses all of the other factors listed in section 190.3.[2] To say that the "circumstances of the crime" includes everything that surrounds the crime "materially, morally, or logically," is to say that this one factor includes everything that is morally or logically relevant to an assessment of the crime, or, in other words, every fact or circumstance having any legitimate relevance to the penalty determination. This expansive definition makes all the other factors listed in section 190.3 unnecessary, because all are included within the "circumstances of the crime" as defined by the majority. For this reason, the construction adopted by the majority is improbable and should be disfavored.

Is there a reasonable construction of "circumstance of the crime" that avoids or at least minimizes overlap with other listed factors? The statutory list includes matters, such as whether the defendant acted under duress and whether the victim participated in the defendant's homicidal act, that would seem to fall under even the narrowest definition of "circumstances of the crime." Yet there is a definition of the statutory factor that substantially

---

[2]These are the section 190.3 penalty factors:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his [or her] conduct.

"(g) Whether or not defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his [or her] conduct or to conform his [or her] conduct the requirements of law was impaired as a result of mental disease or defect, or the affects [*sic*] of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his [or her] participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuated the gravity of the crime even though it is not a legal excuse for the crime."

reduces the overlap with other factors and thus, in my view, most accurately reflects legislative intent.

As used in section 190.3, "circumstances of the crime" should be understood to mean those facts or circumstances either known to the defendant when he or she committed the capital crime or properly adduced in proof of the charges adjudicated at the guilt phase. This definition appears most consistent with the rule of construction that listed items should be given related meaning and with the United States Supreme Court's understanding of the term as reflected in its opinions. (See also, e.g., *Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 174 (lead opn. of White, J.), 188 (conc. opn. of O'Connor, J.) [101 L.Ed.2d 155, 166, 175, 108 S.Ct. 2320] [holding that residual doubt about a capital defendant's guilt is not a "circumstance of the crime"].) I would adopt this construction.

## II

In this case, the prosecutor stated in argument to the jury at the penalty phase that robbery victim Trudy Allessi was so traumatized by the crimes, and in such pain, that she was unable to come to the assistance of her fatally wounded husband, murder victim Sam Allessi, and that she would live with this for the rest of her life. These statements were proper. Our cases establish that the suffering of an immediate victim of a crime, as shown by evidence properly received to prove guilt, is a proper subject of argument as a "circumstance of the crime." (*People* v. *Haskett* (1982) 30 Cal.3d 841, 864 [180 Cal.Rptr. 640, 640 P.2d 776].)

During the penalty phase argument, the prosecutor also mentioned that Sam Allessi died on the sidewalk next to the store he had owned for 40 years and that he had been married to Trudy Allessi for 50 years. Evidence that Sam Allessi owned the store was properly received at the guilt phase to explain his presence at the scene and his possession of the cash taken by defendant in the robbery; therefore, the prosecutor's reference to Sam Allessi's ownership of the store was proper.[3] But it was improper for the prosecutor to refer to the durations of the Allessis' marriage and of Sam

[3]This conclusion is consistent with a hypothetical that Justice Souter has provided to illustrate how in a given case victim impact evidence could be admitted to establish the circumstances of the crime: A minister has been robbed and killed by a stranger while walking from his car to his church office. The minister's wife and daughter are present in the car and witness the stabbing. To explain the victim's presence at the scene of the murder, the prosecutor introduces evidence that the victim was a minister, a personal characteristic. The victim's widow and daughter testify as eyewitnesses of the murder, and this testimony inevitably reveals to some extent how they were emotionally affected by the crime. (*Payne*, *supra*, 501 U.S. __, __ [115 L.Ed.2d 720, 745-746, 111 S.Ct. 2597, 2616-2617] (conc. opn. of Souter, J.).)

Allessi's ownership of the store, facts which reflected favorably on Sam Allessi's character. These facts had no relevance in proof of defendant's guilt of the charged crimes, and the prosecution presented no evidence showing that they were known or reasonably apparent to defendant when he committed the crimes. They were not "circumstances of the crime," nor were they within any of the other factors listed in section 190.3.

Defendant was not prejudiced by the improper remarks, however. They were an insignificant part of the prosecutor's overall argument, which remained correctly focused on the statutory factors. Therefore, I concur in the affirmance of the judgment of death.

### III

Section 190.3 lists the subject matters a jury "shall consider" in a capital case when deciding whether the defendant should be sentenced to death. To determine the meaning of the language used in that statutory list, this court should be guided by neutral principles of statutory construction. The majority has failed to persuade me that a victim's personal characteristics, when unknown to the defendant and irrelevant to proof of guilt, fall within the statutory factor for "circumstances of the crime."

When a jury is determining the penalty for a capital crime, should it take into account the personal characteristics of the victim? This is a difficult and controversial question, as shown by the various opinions on this subject by a closely divided United States Supreme Court. What the trier of penalty *ought* to consider, however, is not the issue before this court. Rather, we must decide whether the electorate, when it voted our current death penalty statutes into law, intended to authorize consideration of these matters. Analysis of the relevant statutory language enacted by the voters, using accepted principles of statutory construction, leads me to conclude that under our state law the jury in a capital case may, and indeed must, consider the victim's personal characteristics that were known to the defendant at the time of the capital crimes or were disclosed by evidence properly received during the guilt phase. But the presently existing statutory authorization goes no further.

Appellant's petition for a rehearing was denied February 19, 1992. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.